Charles L. NELSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8113.

Court of Appeals of Alaska.

April 18, 2003.

David D. Reineke, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Rosamund M. Lockwood, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

A jury selected for a trial in Ketchikan found Charles L. Nelson guilty of first-degree arson, two counts of second-degree criminal mischief, and one count of fourth-degree assault.[1] Nelson raises one point in this appeal: he argues that the superior court erred when it denied his motion to discharge the entire jury panel during voir dire. One potential juror said she had a "very strong opinion" of the defense attorney. When prodded for further explanation, the juror explained that she did not trust the attorney because she felt the attorney "distorted some of the information" when she served as a juror in another trial. The court excused the juror. Nelson moved to discharge the entire panel, but the superior court denied Nelson's motion.

We have examined the record and conclude that the superior court did not abuse

its discretion when it denied this motion and continued to select the jury from the remaining panel. Therefore, we affirm Nelson's convictions.

### Background facts

The details of Nelson's misconduct are of little import in this case. Witnesses testified that Nelson was at Thomas Widmyer's home in Ketchikan on December 10, 2000. Nelson left and Widmyer thought Nelson stole Widmyer's cell phone. Widmyer, Kevin Taylor, and Bonnie Abbott left to look for Nelson. They found him in front of Patricia Duncan's home and confronted Nelson about the theft of Widmyer's cell phone. Abbott said Nelson lunged at her with a knife during this confrontation, but Widmyer did not see this and Abbott was unable to describe the knife at trial. Duncan saw the confrontation and yelled out her window that she was calling the police. Widmyer retrieved his cell phone. Widmyer, Taylor, and Abbott went back to Widmyer's residence. Nelson followed but was told to leave. Nelson began yelling insults and pounding on the door, and when Abbott opened the door, Nelson punched her in the face.

Not long after, Abbott and Widmyer discovered that the garage door and a vehicle outside the garage were on fire. They saw Nelson across the street, watching the fire, holding a gas can, with his leg and arm aflame.

The grand jury indicted Nelson for one count of first-degree arson,[2] two counts of second-degree criminal mischief,[3] one count of third-degree assault,[4] and one count of fourth-degree assault.[5] The trial jury acquitted Nelson of third-degree assault but found him guilty of the remaining counts.

### Did the superior court err by refusing to discharge the entire jury panel?

During the prosecutor's questioning of a proposed juror, the prosecutor asked the

---

**1.** AS 11.46.400(a), former AS 11.46.482(a)(1), and AS 11.41.230(a)(1) respectively.

**2.** AS 11.46.400(a).

**3.** Former AS 11.46.482(a)(1).

**4.** AS 11.41.220(a)(1)(A).

**5.** AS 11.41.230(a)(1).

juror a general question about whether the juror had any strongly held views that the attorneys should know about. The juror responded: "I have a very strong opinion about the other attorney … from a previous trial where I was a juror." The prosecutor's questioning continued without interruption:

*Prosecutor:* Okay. And is that something that either she should be concerned about or I should be concerned about, depending on which way your feeling goes?

*Juror:* I don't trust her.

*Prosecutor:* Okay. So it sounds like in this particular case, the defense should be very concerned about you as a possible juror?

*Juror:* (Inaudible response).

*Prosecutor:* Are you going to hold it against Mr. Nelson—it's Mr. Nelson who is on trial here, not [the defense attorney]. Are you going to hold it against him?

*Juror:* No, I'm not going to hold it against him.

*Prosecutor:* Do you think you can set aside whatever your past experience is with [the defense attorney] and give Mr. Nelson a fair shake?

*Juror:* This has nothing to do with Mr. Nelson.

*Prosecutor:* Exactly. That's exactly my point. And I'm wondering if you're able to make that distinction between Mr. Nelson and his attorney.

*Juror:* Oh, yeah.

*Prosecutor:* Okay. Any other strong concerns in that area or …

*Juror:* No.

At this point, the court indicated it was time for a recess, but asked the juror clarifying questions before excusing the panel:

*The Court:* So if you feel biased against one of the attorneys and I think that's what you were saying, although frankly [the prosecutor] was between the two of us and I couldn't see you. Is that what you were saying, that you feel biased against one of the …

*Juror:* I don't—no, I didn't say I felt …

*The Court:* Protagonist here.

*Juror:* … bias. I said I didn't trust her.

*The Court:* Well, that sounds like a bias to me.

*Juror:* It just means I have to listen real close to—to what she's saying because I—I felt in one of the trials that she was an attorney, that she distorted some of the information.

*The Court:* Right.

*Juror:* Mislead the jury.

*The Court:* Well, I—in other words, you have an opinion about her and it's a strong one at this point?

*Juror:* Well, yeah. I guess. I would just listen real close to make sure she doesn't—like, going to mislead me again.

The court then took a recess. During the recess, Nelson moved to discharge the panel.

*Defense Counsel:* [I] move that all of this jury panel be excused because of [the juror's] comments. I think perhaps, [the juror] might have tainted the jury such that Mr. Nelson is not going to get a fair trial.

Superior Court Judge Michael Thompson said that he would excuse the juror because of the juror's bias but did not excuse the entire panel because "I don't think there's a particular prejudice in her comments."

The court returned the jury panel to the courtroom and addressed the juror.

*The Court:* … I thought some more about your answers to the questions and I felt you should be excused from this case. Don't take that in a negative way, I just think that it [would] be better if we had people here who largely were totally unacquainted with everybody involved and, you know, can start fresh and not start with some sort of baggage involving anybody in the courtroom. So, I'll let you go in this case.

Judge Thompson then excused the juror and jury selection resumed.

Even though Nelson did not designate the remainder of jury selection for transcription, the record does reflect that after Judge Thompson denied the motion to discharge the panel, Nelson individually questioned all

the jurors then seated and those jurors who replaced any who were excused. The State exercised four peremptory challenges and Nelson exercised three. Nelson passed all the remaining jurors for cause. The State challenged one juror for cause, but Nelson opposed the challenge; apparently Judge Thompson upheld the challenge because the record reflects that the State preempted that challenged juror.

Nelson contends that the juror's comment about the defense attorney was prejudicial and that the comment should be analyzed the same as prejudicial pretrial publicity. Nelson argues that the juror's comments were inflammatory and that any juror exposed to the comment would be subject to a challenge for cause whether or not the juror claimed to be impartial.[6] But Nelson's attempt to draw parallels to prejudicial pretrial publicity is flawed.

Judge Thompson was present during the juror's comments and was in a position to evaluate the impact of the comments on the other jurors. Judge Thompson did not believe that there was "a particular prejudice in her comments." Nelson does not discuss this finding but argues that prejudice must be presumed. We reject Nelson's invitation to assume that the juror's comments were so prejudicial that the entire panel had to be excused.

As with many incidents that occur during trial, the court was not powerless to alleviate the potential prejudice from the comment. When Judge Thompson excused the juror, he did explain that it was preferable to have jurors who were not acquainted with the parties so the jurors could start fresh. We also note that Nelson did not object at any point during the juror's questioning or request that continued questioning take place out of the presence of the other jurors. Nor do we have any indication in the record before us that Nelson asked the court to give the panel a limiting instruction.

However, we do not suggest that it is solely a defendant's obligation to manage voir dire in a manner that reduces potential prejudice to a party. It is clear from the transcript that the juror stated clearly her strong opinion about defense counsel without revealing the basis for that opinion. It was only when she was questioned further by the prosecutor that the juror expressed her mistrust of defense counsel and, when questioned by the court, explained that defense counsel misled her in the earlier trial. Obviously, when a juror expresses a patent bias that may expose, in the words of Judge Thompson, "some sort of baggage," the better practice would be to examine that issue without the other jurors present. The transcript we have shows that Judge Thompson did this when other jurors expressed a potential disqualifying reason.

Even so, after Judge Thompson excused the juror, Nelson was able to question each juror individually. Because this portion of voir dire was not designated, we do not know what questions Nelson put to the potential jurors, but it is apparent that Nelson did not challenge any of the jurors for cause and exercised only three peremptory challenges. Even when the State challenged one of the remaining jurors for cause, Nelson objected to the challenge and the court apparently upheld Nelson's objection. The record before us contains no suggestion that Nelson had any continued concerns with the jury after jury selection was complete.

From our review of the record, there is no indication that the jurors who were finally sworn to try Nelson's case were anything but fair, impartial, open-minded jurors. We conclude that Judge Thompson did not abuse his discretion when he denied Nelson's request to discharge the entire panel.

■ We address one last claim by Nelson. In his brief, Nelson raises an issue regarding the proper standard of review. Nelson urges us not to evaluate Judge Thompson's decision under the "abuse of discretion" standard, but rather to employ "the constitutional error standard" of harmless beyond a reasonable doubt.

■ Nelson's argument is based on a misunderstanding of what is meant by the "standard of review." The standard of review is the test for determining whether

**6.** See *Mallott v. State,* 608 P.2d 737, 749 (Alaska 1980).

error has been proved on appeal. The core function of the standard of review is to define the degree of deference that an appellate court must show toward the decision of the trial court.

■ When the claim of error involves a pure question of law, an appellate court shows no deference to the trial court's decision; rather, the appellate court decides the issue independently or de novo. On the other hand, when the claim of error involves an issue of historical fact, an appellate court must show considerable deference to the trial court's finding. The trial court's decision is reviewed under the "clearly erroneous" standard, which means that an appellate court is authorized to reverse the trial court's decision only if, viewing the record as a whole, "the [appellate court is left] with a definite and firm conviction ... that a mistake has been made[.]" [7]

■ On matters involving challenges to jurors, the normal standard of review is "abuse of discretion" because there is generally a range of reasonable responses that a trial judge might make to a particular problem.[8] Under this standard of review, an appellate court is authorized to reverse the trial judge's decision only "if the trial court's decision is clearly untenable or unreasonable." [9]

In contrast to the various standards of review, the rule regarding constitutional error—the "harmless beyond a reasonable doubt" rule—only comes into play *after* an appellate court (employing the proper standard of review) has concluded that error

occurred in the trial court. In such circumstances, the constitutional error rule determines whether a proven error requires reversal of the trial court's judgment.

■ Under this rule, if the error was of constitutional dimension, then the judgment must be reversed unless the appellate court is convinced that the error was harmless beyond a reasonable doubt. But an appellate court does not employ this rule when it decides whether error has occurred. That is, even though a claim of error may involve a potential violation of constitutional guarantees, there is no rule that an appellate court must reverse the trial court's judgment if there is any reasonable possibility that error occurred. Rather, a judgment can be reversed only for proven error. A defendant who claims constitutional error must prove that an error occurred (under the applicable standard of review). Only then does the defendant obtain the benefit of the "harmless beyond a reasonable doubt" rule—when the appellate court turns to the issue of whether this error requires reversal of the judgment.

*Conclusion*

The judgment of the superior court is AFFIRMED.

**7.** *Geczy v. LaChappelle*, 636 P.2d 604, 606 n. 6 (Alaska 1981); *Mathis v. Meyeres*, 574 P.2d 447, 449 (Alaska 1978).

**8.** *See Mitchell v. Knight*, 394 P.2d 892, 897 (Alaska 1964); *Young v. State*, 848 P.2d 267, 269 (Alaska App.1993).

**9.** *Gonzales v. State*, 691 P.2d 285, 286 (Alaska App.1984).