James HARMON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9513.

Court of Appeals of Alaska.

Sept. 19, 2008.

Opinion Granting Rehearing Oct. 9, 2008.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and

Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

James Harmon was convicted of second-degree murder and first-degree sexual assault for his attack on M.W. in Tenakee Springs in March 2003. On appeal, Harmon challenges his convictions on two grounds. First, he argues that his trial should not have been held in Juneau because of the extensive pre-trial publicity surrounding M.W.'s death and, one year later, Harmon's arrest and the procedural events leading up to his trial. Second, Harmon argues that the fairness of his trial was prejudiced by the joinder of a charge alleging that he committed an earlier attempted sexual assault against the same victim. In addition, Harmon contends that his composite sentence is excessive.

For the reasons explained here, we conclude that it was proper to hold Harmon's trial in Juneau, and we further conclude that it was proper to join the earlier attempted sexual assault with the other charges against Harmon. Finally, we conclude that Harmon's sentence is not excessive.

*The venue of Harmon's trial*

We first turn to the issue of whether, because of pre-trial publicity, Harmon's trial should have been moved from Juneau.

The next section of this opinion, which describes this pre-trial publicity in the context of the events leading up to Harmon's trial, is quite detailed. Readers should be aware, before they begin, that Harmon's main contention—*i.e.*, his primary argument as to why this pre-trial publicity prejudiced the fairness of his trial—is based on the fact that some of the newspaper articles reported that Harmon made self-incriminatory statements to an undercover officer working for the Alaska State Troopers. The public dissemination of this information had the potential for prejudicing the fairness of Harmon's trial because the State ultimately agreed that evidence concerning these supposed self-incriminatory statements should not be introduced at the trial.

*The course of the criminal investigation, and the media publicity surrounding that investigation*

M.W. was a 19–year–old woman living in Tenakee Springs, a community of some one hundred residents located fifty miles southwest of Juneau on Chichagof Island. M.W. and her dog "Souk" lived in a cabin by themselves.

James Harmon, who was then 24 years old, had lived off and on in Tenakee Springs for several years. In early 2003, he was living in an old boat moored in the Tenakee Springs harbor.

Harmon and M.W. had acquaintances in common, but they did not know each other well. Harmon had gone to M.W.'s cabin once in 2002 to participate in a card game, and they had gone hunting together once in the winter of 2002.

On December 31, 2002, M.W. and her friend D.W. went to a New Year's Eve party where they encountered Harmon. M.W. and D.W. both became intoxicated at the party, and after the party Harmon accompanied the two women back to M.W.'s cabin. When D.W. indicated that she wanted to return to the party for one more drink, Harmon said that he would help the intoxicated M.W. up the stairs to the cabin. D.W. told Harmon to "be honorable", and she also told him that she would be back in fifteen minutes.

Shortly thereafter, D.W. returned to M.W.'s cabin. She found Harmon with his pants off, straddling M.W., who was lying on the floor with her pants pulled almost completely off. M.W. was saying "no" and telling Harmon to get off her. Upon observing this scene, D.W. yelled at Harmon to get dressed and get out, and Harmon complied.

A short time later, D.W. went outside to smoke a cigarette. She found Harmon sitting on a chair in the arctic entry. Harmon grabbed D.W. by the waist and sat her on his knee. Then he tried to kiss her and touch her breast. D.W. bit Harmon, and he threw her to the floor, where he tried to spread her legs. D.W. continued to fight, and Harmon

ultimately desisted when D.W. managed to get up off the floor. Harmon threw a chair at D.W. and then left.

On February 22, 2003, M.W. departed Tenakee Springs to visit her mother in Juneau. During this visit, M.W.'s mother gave her $1400 in cash for living expenses and to buy a share in a non-profit farm in Belize. M.W. spent approximately $400 of this cash while she was still in Juneau—buying food for herself and dog food for Souk—and then she took the ferry back to Tenakee Springs on March 21st.

M.W. was last seen alive on the afternoon of March 25, 2003, walking her dog Souk towards the Tenakee Springs town area. That evening, residents of Tenakee Springs became concerned after Souk was discovered alone and M.W. could not be located.

The next afternoon (March 26th), Harmon went to the house of his cousin Jason Carter, wanting to play poker. As a general rule, Harmon did not have much money, and he had complained only a few days before that he did not have enough money to buy soy sauce. So when Harmon announced that he wanted to play poker, Carter replied that he did not wish to play—and he jokingly added that Harmon probably had no money to gamble with. In response, Harmon showed Carter a wad of cash, including several $100 bills.

On March 26th and 27th, various Tenakee Springs residents observed Harmon walking from the direction of M.W.'s cabin. On Friday, March 28th, some of M.W.'s neighbors and M.W.'s mother (who had flown to Tenakee Springs from Juneau) entered M.W.'s cabin to look for clues concerning her whereabouts. They found dirty dishes containing half-eaten food, as well as empty food containers that had not been discarded—both uncharacteristic of M.W. They also discovered a pair of large gloves and a cassette player that was playing music in the cabin.

On March 28th, the mayor of Tenakee Springs called the Alaska State Troopers to report that M.W. was missing, and residents began a search for M.W. The first state trooper arrived later that day to investigate.

During this initial investigation, a state trooper contacted and interviewed Harmon. Harmon told the trooper that he had spent several hours working at the earthen dam near M.W.'s cabin the previous weekend (i.e., the weekend of March 22nd–23rd), and that he saw M.W. while he was there, but did not talk to her. Harmon also told the trooper that he had not been inside M.W.'s cabin since the previous summer.

The following day (March 29th), a fingerprint expert working for the Department of Public Safety's Crime Laboratory arrived in Tenakee Springs to examine M.W.'s cabin. He was able to lift twenty-three latent prints from various locations and items in the cabin. Of these twenty-three fingerprints, nineteen were later identified as Harmon's. Many of Harmon's prints were lifted from items that had obviously been handled recently, such as an unwashed plate and two unwashed bowls (all containing food residue), a pretzel bag with some pretzels still in it, and an opened can of olives.

On March 30th, a trooper investigator re-interviewed Harmon. During this interview, Harmon told the investigator that there was no reason why his fingerprints, or any of his possessions, would be found in M.W.'s cabin. Later that day, Harmon left Tenakee Springs, traveling on the state ferry to Sitka. He paid cash for his ticket. In Sitka, Harmon purchased a one-way airplane ticket to Juneau—again paying cash.

On April 1, 2003, M.W.'s body was found buried in the earthen dam near her cabin. An autopsy revealed that she had been sexually assaulted and then strangled.

On April 4th, the troopers executed a search warrant for Harmon's person. He was found to be carrying a bank deposit slip showing a $500 deposit into his account on April 1st, as well as receipts for various cash purchases in Juneau (totaling slightly over $166) and another $109 in cash.

Related investigation revealed that the only money Harmon received during this period was $35 for his work on the dam, plus a $100 check that he received from his mother. The bank employee who cashed this check remembered that Harmon received $10 and

$20 bills for the check, rather than a single $100 bill.

For the next twelve months, no one was arrested for M.W.'s murder, and the investigation into her death had seemingly come to a standstill. There was considerable sentiment among the public that the state troopers were derelict in failing to pursue this matter. Several individuals wrote letters to the editor of the Juneau Empire, complaining of this apparent inaction and this seeming lack of concern on the part of law enforcement officials. The Empire also carried stories about the murder on March 1, 2004 (with the headline "Tenakee looks for justice") and on April 4, 2004 (with the headline "A year later: a murder unsolved").

But, in fact, the state troopers were actively investigating the case. As part of this investigation, Trooper Eric Lorring went undercover, posing as a sex offender who was hiding in Juneau from a criminal investigation in Kodiak. In this guise, Lorring befriended Harmon and, over time, encouraged him to speak about what had happened to M.W. These conversations were secretly recorded pursuant to a *Glass* warrant.[1]

In his conversations with Lorring, Harmon initially denied responsibility for M.W.'s death. But in later conversations, Harmon admitted that he sexually assaulted M.W. and that, during their struggle, M.W. died—although Harmon declared that he did not remember exactly how M.W. had died: "it . . . happened so quick, I don't know, just—she fell over the couch, hit her head on something".

On Thursday afternoon, May 20, 2004, as a result of this investigation, the state troopers arrested Harmon. The following day (May 21st), the State filed murder and sexual assault charges against him. That same day, an article appeared in the Juneau Empire, reporting Harmon's arrest but quoting a trooper spokesperson's statement that "he could not say what information led to the arrest".

Two days later, on Sunday, May 23rd, the Juneau Empire published the first two in a series of articles describing the criminal charges against Harmon, describing some of the evidence against Harmon, and reporting some of the procedural aspects of the court case.

The headline of the first May 23rd article was "DA: Accused [man] talked about killing [M.W.]". The text of this article contained the following:

> James D. Harmon said the wrong things to the wrong man not long before his arrest Thursday on charges he murdered [M.W.] in Tenakee Springs more than a year ago, according to the Juneau district attorney. . . . In an affidavit filed with the court, [District Attorney Patrick] Gullufsen said [that] Harmon talked with an undercover officer earlier this month about raping and killing [M.W.].

This same article also reported that the State had asked the court to set Harmon's bail at $750,000 cash, and that "[i]n support of [this] bail request, Gullufsen told [the magistrate] that Harmon had talked to an undercover officer this month about leaving Alaska to 'avoid the heat' surrounding the [M.W.] investigation."

However, the second article that appeared in the Empire that same day (May 23rd) portrayed Harmon in a more favorable light. The headline of this article was "Former boxer 'kept to himself'", and the text of the article contained several quotes from Harmon's family and friends, who described him as "a kind and gentle young man"—someone "who had a hard time making friends" and who "kept to himself [but] seemed polite enough". The president of the Ketchikan fight club—apparently, a boxing and martial arts association that organized fights in which Harmon had sometimes competed as a boxer—was quoted as saying that he had "never known [Harmon] to do anything violent".

On Friday May 28th, a Juneau grand jury indicted Harmon on alternative charges of first- and second-degree murder (under a

---

1. *See State v. Glass,* 583 P.2d 872 (Alaska 1978) (holding that, under the Alaska Constitution, the police need a warrant to secretly electronically monitor or record conversations with criminal suspects, even when one participant to the conversation consents).

felony murder theory), alternative charges of completed and attempted first-degree sexual assault, and second-degree theft (for taking M.W.'s money and property). The indictment also contained two charges of attempted first-degree sexual assault stemming from Harmon's alleged attacks on M.W. and D.W. in the early morning hours of January 1, 2003.

The issuance of this indictment was reported in the Juneau Empire on Sunday, May 30th ("Harmon indicted in Tenakee killing"). This article reported that Harmon "left Tenakee Springs on an Alaska Marine Highway ferry before [M.W.'s] body was found", and that "[c]ourt records show [that the] troopers considered him a suspect early in the investigation". The article further reported that, during the execution of the search warrant for Harmon's person, "[the] authorities seized cash and receipts that the state alleges shows [sic] he took money from [M.W.]".

The following week, the Empire ran two articles (dated June 3rd and June 4th) reporting that the Public Defender Agency had been appointed to represent Harmon, that Harmon had pleaded not guilty to the charges against him, and that Harmon's trial was tentatively scheduled for August 2004. These two articles reiterated the charges against Harmon, but they contained no description of the evidence against him.

On June 29th, the Empire ran a short article reporting that Harmon's defense attorneys had told the superior court that an August trial date would not give them sufficient time to prepare, and that they were proposing a trial date of February or March 2005. And on July 18th, the Empire reported that the superior court had granted the defense attorneys' request for a March trial date. Again, these articles briefly reiterated the charges against Harmon, but they did not describe the evidence against him.

On July 29, 2004, the Empire reported that the superior court had denied Harmon's request for reduced bail. In explaining the attorneys' arguments for and against the modification of bail, the Empire described District Attorney Gullufsen as having told the court "that an undercover officer recorded Harmon talking about leaving for Canada the night before his May 20 arrest". The Empire also reported that, when Harmon's mother was cross-examined by Gullufsen concerning any instances in the previous five years when her son had "checked out in terms of reality", Harmon's mother admitted that (in the reporter's words) "there was one such incident in Tenakee Springs in 2000 in which she had to go there to assist him".

On the other hand, this same article reported that Harmon had no prior criminal history. And, concerning Harmon's statement that he was thinking of leaving for Canada, the article reported the defense attorney's response: that Harmon made this statement more than a year after the homicide, and that the topic of Canada was initiated by the undercover officer who befriended Harmon.

The next time that the Juneau Empire mentioned this case was in its year-end wrap-up of the news. In the thirty-sixth paragraph of a forty-three-paragraph article that appeared in the newspaper on December 31, 2004, the Empire reminded its readers that Harmon had been arrested for the murder of M.W. in Tenakee Springs. This same paragraph noted that Harmon was arrested "after he allegedly made statements to an undercover officer", but Harmon's statements were not described.

The next stage in the media coverage of this case commenced in mid-January 2005, when Harmon's lawyers sought another delay of his trial.

On January 14th, the Empire carried a story, "Defense seeks postponement of [M.W.] murder trial". In addition to describing the defense request for a continuance, this story contained the assertions that (1) Harmon had made incriminating statements to the undercover state trooper, and that (2) Harmon's attorneys would be asking the superior court to suppress some of those statements:

In court, Juneau District Attorney Patrick Gullufsen alleged that Harmon made incriminating statements to a trooper working undercover. [Harmon's defense attorney said] that he is still waiting for recordings of [the] "wired conversations"

between the trooper and his client.... [The defense attorney] hopes to suppress some statements from being used as evidence against his client....

On January 26, 2005, the Empire reported that the superior court had granted the defense request for a postponement of the trial, and that Harmon's trial was now scheduled to begin on April 4, 2005. ("[M.W.] murder trial rescheduled—defense [attorney] hopes to have charges against his client dismissed").

This article contained the following description of the defense attorney's reasons for seeking a continuance:

> In his motion to postpone the trial, [the defense attorney] wrote that he plans to argue to keep statements his client allegedly made to officers from being used against him.

The next paragraph of the article explained what statements the defense attorney was talking about:

> The affidavit showing [the] foundation for Harmon's arrest by state troopers alleges he made incriminating statements to a trooper who was working undercover.

One month later, on February 27, 2005, the Empire carried a story entitled "Defendant in [M.W.] case will dispute evidence, statements". This article again reported the State's assertion that Harmon confessed to the undercover officer that he sexually assaulted and killed M.W. The article also suggested that Harmon's attorneys planned to argue that Harmon's statements were the product of improper police interrogation:

> The attorney for James D. Harmon ... gave notice last week that he plans to call expert witnesses to dispute scientific evidence and question statements his client allegedly made to state troopers.... In justifying the charges for [Harmon's] arrest, [District Attorney] Gullufsen wrote that Harmon had told an undercover state trooper that he killed [M.W.] and sexually assaulted her, court records show.... [Harmon's defense attorney] gave notice last week that he plans to call Richard J. Ofshe, a professor emeritus at the University of California–Berkeley[.] ... Ofshe

... is an expert on improper influence in police interrogation, [the defense attorney] wrote.

A week later, on March 6, 2005, the Empire again reported that Harmon's attorneys intended to rely on expert testimony to establish that Harmon's statements to the undercover trooper were the product of improper interrogation: "Defense in [M.W.] killing slaps troopers". This article reported that Harmon appeared in court, "flanked by attorneys fighting to keep his alleged confession from being used against him." The article continued:

> The undercover trooper last year recorded Harmon's statement, in which he lamented he was not well-liked. [In the motion to suppress Harmon's statements, the defense attorney wrote that] Harmon was the man everyone assumed killed [M.W.] in Tenakee Springs two years ago—and they pressured [the] troopers to get him[.]
>
> ...
>
> In her motion ..., [the defense attorney] argued that [the] troopers improperly used psychological pressure and an offer of money to get what they needed to arrest [Harmon].

On the other hand, the article offered a potentially exculpatory explanation for Harmon's decision to leave Tenakee Springs on the state ferry at the end of March 2003:

> Harmon caught the Sitka-bound ferry out of Tenakee Springs on March 30, 2003, after people allegedly harassed him and threatened his life during the search for the missing woman.

The article then offered the defense attorneys' description of the undercover investigation that led to Harmon's arrest:

> [The defense attorney asserted that] Trooper Eric Lorring befriended Harmon on March 10, 2004, in Juneau. [Lorring] told Harmon [that] he was on the run from Kodiak as the target of a sexual assault investigation....
>
> [The defense attorney asserted that, "d]uring their three-month 'friendship', Trooper Lorring repeatedly cooked dinner for ... Harmon, watched movies with him,

denigrated women with him, took him drinking[,] and went out with him looking for 'hotties' " . . . .

[The defense attorney asserted that the *Glass* warrant] recordings show that Lorring asked Harmon on April 21, 2004, about what happened at Tenakee Springs, and Harmon said [that] he couldn't say anything on the advice of his attorney. . . . [The] [t]roopers [then] orchestrated an incident on May 9 at which Lorring took Harmon to . . . an outdoor boat show . . . [and another] investigator who posed as the best friend of [M.W.'s] mother confronted Harmon, accusing him of killing [M.W.].

[Afterwards,] Lorring drove Harmon to a parking lot . . . to talk. . . . Harmon said three times that he couldn't talk about it on the advice of his attorney, but Lorring said [that Harmon's] lawyer was "not your friend, man". He told Harmon he wanted to help. [According to the defense attorney, Lorring told Harmon,] "if you need money, . . . I got money." . . . "I don't have a lot, but I got some to help you. I got friends that can help you out[, but] I need to know what's going on."

The article quoted the defense attorney as arguing that "[all of Harmon's] statements made after Trooper Lorring promised him money for telling him 'what was going on' must be suppressed." The article also quoted the defense attorney as asserting that Harmon's will was "clearly overborne as a result of the intense and relentless psychological pressure and unconstitutional promises made to him by [the] troopers", and that "Harmon lacked sophistication, had low intelligence[,] and was psychologically vulnerable."

On March 13, 2005 (*i.e.*, one week after the article just described), the Empire carried an article describing the State's response to the defense motion to suppress Harmon's statements: "Prosecutors say Harmon not coerced". In this article, the Empire again reported that Harmon's attorneys had "filed a motion seeking to keep statements [Harmon] made to an undercover trooper from being used at his trial." The article then described the arguments presented in that defense suppression motion:

[According to the defense attorneys,] the Tenakee Springs community considered Harmon the logical suspect [in the murder], making him the focus of unfair investigative tactics. [The defense attorneys] compared [Harmon] to a misunderstood character in Harper Lee's novel, "To Kill a Mockingbird", and argued that he was coerced into making a possibly "false confession" to a "false friend".

. . .

The defense argued that incriminating statements Harmon allegedly made from May 9 through May 12, 2004, came after he insisted he couldn't talk about Tenakee Springs on the advice of his attorney.

The article also described the State's response to the defense suppression motion. The article quoted the prosecutor as asserting that "Harmon's statements to his false friend were not coerced, and [Harmon's] free will was not overborne by any words or conduct".

In the end, the defense motion to suppress Harmon's statements was never litigated to conclusion. Instead, on March 21st, the parties stipulated that, so long as Harmon did not take the stand at his trial, there should be "no testimony or evidence from either party regarding the undercover operation from February 2004 until Mr. Harmon's arrest in May 2004; [or regarding] Trooper Lorring's role with Mr. Harmon, or statements Lorring made to James Harmon, or the staged confrontation with [the other trooper investigator] at the used boat show on May 9, 2004; [or any] statements James Harmon made to Trooper Lorring".

The following day, this stipulation was reported in the Juneau Empire in an article entitled "State won't use Harmon disclosures". This March 22nd article contained the following description of the controversy and its resolution:

Prosecutors have agreed not to use statements that James Harmon allegedly made to an undercover state trooper when they try Harmon next month for the 2003 killing of Tenakee Springs resident [M.W.].

"That evidence will not be part of the trial," Juneau District Attorney Patrick Gullufsen told Ketchikan Superior Court Judge Trevor Stephens Monday at a hearing scheduled for [the] attorneys to argue the admissibility of the statements.

Harmon's defense [attorneys] charged ... that troopers improperly used psychological pressure to coerce statements they needed to arrest him.... Monday, [the] attorneys presented an agreement [to the court which] excludes evidence or testimony from the undercover officer at [Harmon's] trial, [but] adds that the defense will not contest the introduction of possibly incriminating statements Harmon ... made on videotape after his May 20, 2004 arrest.

The article also provided this background information about the parties' stipulation:

Less than two weeks before Harmon was arrested, he allegedly incriminated himself while talking to a trooper he believed to be a Kodiak man who was in Juneau avoiding a sexual assault investigation. [The defense attorney] planned to call an expert on false confessions to dispute Harmon's alleged statements to the undercover officer.

On April 4, 2005—*i.e.*, two weeks after the publication of this article—the court and the parties began jury selection for Harmon's trial.

*The test for whether trial venue should be changed because of pre-trial publicity: the Alaska Supreme Court's decision in Mallott v. State*

As just explained, there was a substantial amount of pre-trial publicity in Harmon's case. This media coverage took place in three stages. The first stage took place in 2003, after M.W.'s body was found. The second stage took place in the spring and summer of 2004, after Harmon was arrested and charged with the murder. The third stage took place in the early months of 2005, when Harmon's attorneys began their efforts to suppress his statements to the undercover officer.

Based on this publicity, Harmon asked the superior court (both before jury selection and after jury selection was complete) to move his trial from Juneau to another city where these events had not received the same amount of media attention.

The Alaska Supreme Court's decision in *Mallott v. State*, 608 P.2d 737 (Alaska 1980), is the seminal Alaska appellate decision on pre-trial publicity and its potential effect on jury selection in criminal trials. In *Mallott*, the supreme court adopted the recommendation of the American Bar Association regarding the standards that courts should apply when deciding motions to change venue in criminal cases that have received substantial pre-trial publicity:

A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required.

*Mallott*, 608 P.2d at 748.

When the supreme court stated that "a showing of actual prejudice [is] not ... required", the court meant that if the pre-trial publicity is sufficiently prejudicial, a defendant will not be required to affirmatively demonstrate that the particular people selected to serve on the jury actually harbor prejudice or bias. Rather, in such cases, the intensive dissemination of prejudicial pre-trial publicity may itself provide a substantial reason to doubt the impartiality of the jurors—even those who successfully pass through a normal selection process. As the supreme court explained in *Mallott*, the question is whether there is a likelihood that, despite voir dire, the jury panel "harbor[s] unrevealed prejudices as a result of the publicity." *Mallott*, 608 P.2d at 748; *see also Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 360 (Alaska 1996) (applying the *Mallott* standard to civil litigation).

In *Mallott*, the supreme court also adopted the American Bar Association's standards for evaluating the acceptability of a prospective juror who has been exposed to prejudicial pre-trial publicity:

A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.

*Mallott*, 608 P.2d at 749 (quoting the ABA *Standards Relating to the Administration of Criminal Justice*, "Fair Trial and Free Press", § 8–3.5(b) (1978)).

■■■ As this Court explained in *Stavenjord v. State*, 66 P.3d 762, 768 (Alaska App. 2003), under the *Mallott* standard, (1) a prospective juror who concedes that they are unable to set aside preconceptions developed about the case must be excused; and (2) a prospective juror who has been exposed to material that is highly inflammatory or highly incriminating must be excused even if the juror claims the ability to decide the case impartially—because the juror's exposure to the prejudicial material makes that claim suspect.

■■ On the other hand, a prospective juror is not automatically disqualified simply because they have acquired some knowledge of the facts of the case through the media, or even if they have formed an opinion about the case, so long as that opinion is not based on exposure to inadmissible evidence or other highly inflammatory material. *Id.* In such instances, the trial judge must individually assess the credibility of the prospective juror's claim that they can decide the case impartially. *Id.*

*The jury selection in Harmon's case*

The jury selection for Harmon's trial began on April 4, 2005—just two weeks after the final newspaper article discussed above. The judge presiding over Harmon's trial was Superior Court Judge Trevor N. Stephens.

All told, seventy-five prospective jurors were called to court and personally questioned during the jury selection in Harmon's case. In addition to this in-court questioning, each prospective juror was asked to fill out a questionnaire before they came to court. In this questionnaire, the prospective jurors were asked (among other things) to describe what, if anything, they had read or heard about the case.

The issue of the effect of the pre-trial publicity in Harmon's case was raised and litigated during the individual questioning of the very first prospective juror. This prospective juror, M.J., indicated in her questionnaire that she had read a few newspaper articles about the case—and that, based on these articles, she knew that Harmon "supposedly admitted [that] he committed the murder to an undercover officer who befriended him."

During individual questioning, M.J. elaborated on what she wrote in her questionnaire. In response to questions by one of Harmon's defense attorneys, M.J. stated:

M.J.: I read the articles in the paper—that [M.W.] was murdered . . . and that—I don't remember all the details, but . . . I guess the main things that I remember are: she was murdered near her cabin, and some people found her body . . . buried in the ground, and that there was an investigation; it took quite a while. And then it—supposedly Mr. Harmon confessed to some undercover detective that he did it. That's pretty much what I've heard—read . . . in the [Juneau] Empire.

*Defense Attorney:* And so you have read that [Harmon] confessed . . . that he did these things to an undercover trooper . . . ?

M.J.: That's what I read in the paper.

*Defense Attorney:* So what do you think about that?

M.J.: I guess I don't really know that what's—you know, the paper was pretty one-sided, in my opinion. They did—you know, there was no statements from Mr. Harmon or anything. So I don't really know. . . . I don't really know whether he did it or not. I'm not privy to any of the facts or anything. And just from what I've experienced in my life with the newspapers, they're wrong quite a bit.

During questioning by the prosecutor, M.J. declared that she did not believe everything she read in the newspaper. She further

stated that she understood that her decision as a juror had to be based solely on the evidence presented in court, and not on what she might have read or heard outside of court. She also responded affirmatively when asked whether she presumed Harmon to be innocent, and whether she would hold the State to its burden of proving guilt beyond a reasonable doubt.

Thus, the *voir dire* of this first prospective juror, M.J., vividly presented the issue of whether to seat a juror who (1) was aware of the newspaper report that Harmon had incriminated himself in conversation with the undercover officer, but who (2) repeatedly declared that she could keep an open mind, and that she would make her decision based solely on the evidence presented in court.

At the conclusion of this individual questioning, the defense challenged prospective juror M.J. for cause under *Mallott,* based on her exposure to the media publicity concerning Harmon's self-incriminating statements to the undercover officer (because these statements were not going to be admitted at trial). The prosecutor opposed the challenge—noting that M.J. had repeatedly stated that she would keep an open mind, that she would base her decision solely on the evidence presented in court, and that she would be fair.

As explained above, this Court held in *Stavenjord* that a prospective juror who has been exposed to material that is highly inflammatory or highly incriminating must be excused even if the juror claims the ability to decide the case impartiality. Judge Stephens concluded that, in Harmon's case, the media reports of Harmon's supposed confession to the undercover trooper were the kind of information that required application of this rule. Accordingly, Judge Stephens concluded that any prospective juror who remembered that Harmon had made self-incriminating statements to the undercover officer would have to be excused from jury duty:

*The Court:* [When there has been substantial pre-trial publicity about a criminal prosecution, the court must pay close attention to a] prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession or other incriminating matters that may be inadmissible, or substantial amounts of inflammatory material. It's not enough that the person has been exposed to it; ... they would have to remember it.... [But if that is the case, then] it doesn't matter under *Mallott* whether the person says they can set it aside or not. They have to be excused. And Ms. [J.] falls into that category.

...

I think, under the case law, ... I have to excuse Ms. [J.], although everything [the prosecutor] said is true—about her statements [that she had the] ability to set [the pre-trial publicity] aside.

When the prosecutor objected that Judge Stephens's interpretation of the *Mallott* decision was too broad, and that prospective jurors should be allowed to sit if they were prepared to set aside the pre-trial publicity, Judge Stephens responded:

*The Court:* I feel bound by *Mallott.* ... That's how I read *Mallott,* and I have to apply it, no matter what the juror says.... It's not just simply exposure [to prejudicial pre-trial publicity]. It's exposure *and* remembering it—and [with regard to Ms. J.], that [is] the case.

(Emphasis added.)

The remaining seventy-four prospective jurors were individually questioned over the course of the next four days (April 4th through April 7th).

Of these, twenty-four prospective jurors— basically, one-third of them—had essentially no knowledge of the media coverage. In the order in which they were questioned, these prospective jurors were:

| W.S. | C.T. | M.C. | Am.M. | L.C. | G.C.[2] | C.L. |
|------|------|------|-------|------|---------|------|
| M.S.M. | J.J. | V.W. | E.H. | K.H. | L.J. | I.C. |
| Al.M. | Jo.L. | G.M. | A.C. | Mi.M. | F.O.M. | J.Y. |

**2.** G.C. admitted that he looked at one article: an article that appeared following Harmon's ar-

rest—because the article mentioned Harmon's name, and G.C. had a former supervisor whose

C.D.[3]   J.H.[4]   Jo.T.

Another thirty-four prospective jurors— that is, 45 percent of the selection pool— knew the basic facts of the case, but did not know that Harmon had made statements to an undercover trooper.   In the order in which they were questioned, these prospective jurors were:

| W.B. | H.D.[5] | J.R.[6] | D.S.W. | Pe.M. | Su.C. | J.F.[7] |
| J.D.[8] | Du.R.[9] | F.H.[10] | L.M. | L.H. | Ma.M. | N.L. |
| An.R.[11] | A.W. | D.L. | E.M. | S.H. | M.S. | J.S.G. |
| Ju.L.[12] | R.R. | A.P.[13] | Pa.M. | T.G. | Di.C.[14] | R.M. |
| B.P.[15] | Ja.M.[16] | Al.R. | Ja.T. | St.C.[17] | M.Y. | |

name was "Harmon".   But as soon as G.C. saw that the "Harmon" named in the article was not his former supervisor, "[he] just put the paper down".

3.  C.D. stated that he did not subscribe to the Empire, and that he had not heard anything about the case "[except] gossip".

4.  J.H. stated that he had read a single article about the case—an article that appeared following Harmon's arrest—because J.H.'s name was so similar to the defendant's.   But J.H. stated that he remembered nothing specific from reading the article.

5.  H.D. was not asked about any details of what she remembered about the coverage;  instead, she was successfully challenged for cause by the defense because she had previously been the victim of a violent crime.   In its challenge, the defense made no mention of pre-trial publicity.

6.  J.R. was challenged for cause by both sides, but not because of exposure to the pre-trial publicity. Seemingly, the grounds for the joint challenge were that J.R. had already concluded that the proper verdict in the case was manslaughter, and also that he was friends with Harmon's father and brother.   The joint challenge was granted.

7.  J.F. was excused—not for cause, but because her adoptive aunt was terminally ill and was not expected to live more than a few more days.

8.  The defense challenged J.D. under *Mallott*, but even the defense attorney conceded that this challenge was "[not] necessarily automatic"— because, although J.D. recalled that the investigation had involved an undercover officer, J.D. had no recollection that Harmon had made self-incriminatory statements to the undercover officer.   The court denied the *Mallott* challenge. The defense later exercised a peremptory challenge against J.D.

9.  The defense challenged Du.R. for cause, but not under *Mallott*.   Rather, Du.R. stated that he believed that Harmon was guilty, and that he could not presume him to be innocent.   The court granted the challenge.

10.  F.H. was excused, but not because of what he learned from the media coverage of the case. Rather, F.H. informed the court that he had a number of friends who were police officers, and these officers had told him that they were fairly sure that the right person had been arrested and charged.   F.H. declared that he would have a hard time setting his friends' opinion aside.

11.  An.R. had read some of the media coverage, but she also conceded that, based on conversations with co-workers, she had come to an opinion about the case that she would be unable to set aside.   The defense challenged An.R. for cause—but not under *Mallott*—and the court granted this challenge.

12.  Ju.L. remembered that someone had befriended Harmon, and that Harmon had told this friend "something", and that "whatever it was [that Harmon said] led ... the friend to think that [Harmon] was guilty of this crime".   But Ju.L. did not remember anything about who this friend was, nor did Ju.L. remember any details about what Harmon had said to the friend to make the friend think that Harmon was guilty. On this basis, Judge Stephens denied the defense attorney's *Mallott* challenge.   The judge pointed out that the jurors *would* hear evidence at trial of other statements that Harmon made to various friends.

Later, when the defense attorneys had the opportunity to exercise a peremptory challenge against Ju.L., they declined to do so.   Instead, they allowed Ju.L. to sit as one of the members of the jury.

13.  A.P. was excused for cause, but not on *Mallott* grounds.   Rather, he declared that he would hesitate to convict anyone of so serious a charge, even if the State proved the case beyond a reasonable doubt—although he also declared that he would "probably vote the same way the other jurors would, just to get it over with."

14.  The defense challenged Di.C. for cause—but not on *Mallott* grounds.   Rather, the challenge was based on the fact that Di.C. appeared to have a fixed opinion about the case.   The court denied this challenge for cause.

15.  B.P. was excused because she was nursing an infant.

16.  The defense challenged Ja.M. for cause, but not on *Mallott* grounds.   Rather, they challenged

Finally, sixteen prospective jurors—that is, slightly more than one-fifth—knew that Harmon had supposedly made statements to an undercover trooper. In the order in which they were questioned, these prospective jurors were:

| K.B. | M.J. | C.E. | Jo.M. | C.B. | L.M.[18] | W.J. |
| Da.R. | D.S. | P.H. | L.W.[19] | D.K. | R.B. | F.E. |
| Da.C. | S.S. | | | | | |

Of these sixteen prospective jurors, Judge Stephens granted *Mallott* challenges to all but one: L.W. Harmon's attorneys later exercised a peremptory challenge against L.W.

*The superior court's ruling on Harmon's post-jury selection request for a change of venue*

On the morning of April 8, 2005, with jury selection complete, Harmon's attorneys asked Judge Stephens to move Harmon's trial out of Juneau because of the extensive pre-trial publicity in the case. Judge Stephens denied this motion.

Although Judge Stephens agreed that Harmon's case generated extensive pre-trial publicity, the judge disagreed with the defense attorneys concerning the nature of this publicity. The judge stated that, even though newspaper articles reported that Harmon had made statements to the undercover trooper, "the substance of [these] conversations [was not] reported or revealed, or really even characterized in any great detail".

On this issue, having reviewed the record, we agree with Harmon that the judge was wrong. The pre-trial publicity did communicate the fact that, at least according to the State's allegations, Harmon had confessed to the undercover trooper.

As we explained earlier in this opinion, on May 23, 2004, three days after Harmon was arrested, an article appeared in the Juneau Empire bearing this headline: "DA: Accused [man] talked about killing [M.W.]". And the text of this article contained the following:

James D. Harmon said the wrong things to the wrong man before his arrest Thursday on charges he murdered [M.W.] in Tenakee Springs more than a year ago, according to the Juneau district attorney. . . . In an affidavit filed with the court, [District Attorney Patrick] Gullufsen said [that] Harmon talked with an undercover officer earlier this month about raping and killing [M.W.].

Similar assertions were contained in the series of articles that appeared in January, February, and March 2005—in other words, during the three months preceding Harmon's trial. These articles described the defense attorneys' attempts to suppress the statements that Harmon had made to the undercover trooper.

On January 14, 2005, in an article describing a defense request for a postponement of Harmon's trial, the following information was presented:

In court, Juneau District Attorney Patrick Gullufsen alleged that Harmon made incriminating statements to a trooper working undercover. [Harmon's defense attorney said] that he is still waiting for recordings of [the] "wired conversations" between the trooper and his client. . . . [The defense attorney] hopes to suppress some statements from being used as evidence against his client. . . .

On January 26, 2005, the Empire published another article which referred to the State's allegation that Harmon had made "incriminating statements to a trooper who was working undercover".

Ja.M. because he appeared unable to "focus fully on the case". The court denied this challenge.

17. The defense challenged St.C. for cause, but not on *Mallott* grounds. Rather, the challenge was based on his friendship with various police officers. The court denied this challenge.

18. The court initially took the *Mallott* challenge of L.M. under advisement, but the court later granted the challenge.

19. L.W. remembered that Harmon had made "statements" to the undercover officer, and he also remembered that there was some question as to whether these statements were going to be allowed into court, but L.W. never characterized these statements as incriminatory. On this basis, Judge Stephens denied the defense attorney's *Mallott* challenge.

And one month later, on February 27, 2005, the Empire carried a story entitled "Defendant in [M.W.] case will dispute evidence, statements". This article again reported the State's allegation that Harmon had confessed to sexually assaulting and killing M.W.—and the article also suggested that Harmon's attorneys planned to argue that Harmon's statements were the product of improper police interrogation:

The attorney for James D. Harmon ... gave notice last week that he plans to call expert witnesses to dispute scientific evidence and question statements his client allegedly made to state troopers.... In justifying the charges for [Harmon's] arrest, [District Attorney] Gullufsen wrote that Harmon had told an undercover state trooper that he killed [M.W.] and sexually assaulted her, court records show.... [Harmon's defense attorney] gave notice last week that he plans to call Richard J. Ofshe, a professor emeritus at the University of California–Berkeley[.] ... Ofshe ... is an expert on improper influence in police interrogation, [the defense attorney] wrote.

A week later, on March 6, 2005, the Empire reported that Harmon had appeared in court, "flanked by attorneys fighting to keep his alleged confession from being used against him." This article quoted the defense attorney as arguing that "[all of Harmon's] statements made after Trooper Lorring promised him money for telling him 'what was going on' must be suppressed." The article also quoted the defense attorney as asserting that Harmon's will was "clearly overborne as a result of the intense and relentless psychological pressure and unconstitutional promises made to him by troopers", and that "Harmon lacked sophistication, had low intelligence[,] and was psychologically vulnerable."

On March 13, 2005 (*i.e.*, one week after the article just described), the Empire carried an article describing how Harmon's attorneys were arguing "that incriminating statements Harmon allegedly made from May 9 through May 12, 2004, came after he insisted he couldn't talk about Tenakee Springs on the advice of his attorney."

It is true that the newspaper articles never asserted that it was a proven fact that Harmon had confessed. Rather, the newspaper was careful to characterize this matter as the State's *allegations* that Harmon had confessed. However, the news articles repeatedly characterized Harmon's statements to the undercover trooper as allegedly "incriminating" or as an alleged "confession"—and, in two instances, the Empire reported that, according to the State, Harmon had directly admitted sexually assaulting and killing M.W.

However, as explained above, only sixteen of the prospective jurors (approximately one-fifth of the total) knew that Harmon had said anything to an undercover investigator. Moreover, the superior court granted Harmon's *Mallott* challenge to fifteen of these sixteen, and Harmon later exercised a peremptory challenge against the remaining one.

Only one person who sat on Harmon's jury—Juror Ju.L.—knew that Harmon had made pre-arrest statements about the case. And, at least according to Ju.L.'s answers on the questionnaire and during individual questioning in court, she did not know that these statements were made to an undercover officer, nor did she know any of the details of these statements, or whether these statements could be characterized as a confession.

Of the other fifteen jurors who sat on Harmon's case, four had absolutely no prior knowledge of the case,[20] and the other eleven knew only minimal facts about the case.[21]

---

**20.** Jurors K.H., L.J., A.C., and J.Y.

**21.** Here is what these eleven jurors said respecting their prior knowledge of the case. The reader should be aware that some of the information stated by these jurors is wrong. That is, several of the jurors' assertions about the specific facts of the case are at variance with the evidence. We quote these assertions, not for the truth of these matters, but only for the purpose of evaluating

Harmon's claim that the jury pool was prejudiced by the pre-trial publicity.

Juror W.B.: "[I read just] an article in the newspaper when it first came out." *Q:* "Okay. Do you remember the content of the article at all?" *A:* "No, not—not really.... I just briefly read, like, the main parts, and [then] just kind of kept reading the paper." *Q:* [When did you read this article?] *A:* "When it first came out. It's been—I was going to say years. Months ago. I

As this Court explained in *Cheely v. State*, 861 P.2d 1168, 1175 (Alaska App.1993), even when a criminal case has received intensive pre-trial publicity, "the question [under the *Mallott* test] is not how many biased prospective jurors were identified and excused". Rather, "the question is whether there is substantial reason to doubt the impartiality of the jurors who remained after the selection process was complete."

The *Cheely* case involved one of two co-defendants, Cheely and Gustafson, who were accused of murder arising from a highway shooting. (Cheely and Gustafson believed that another car had cut them off; in response, Cheely maneuvered their vehicle so that Gustafson could fire a rifle bullet into the other car.) [22]

The case received widespread media attention in Anchorage, and most of the media coverage was distinctly unfavorable to Cheely and Gustafson.[23] Moreover, the media attention was renewed just before Cheely went to trial—because Gustafson's case went

mean, when it.... And that's the only time I've seen anything [about the case.]"

Juror M.C.: "[T]he only thing I know about—I know that when I was in Tenakee, there were little posters up saying—anxious about them finding somebody ... you know, solving the case. And then I know that they did make an arrest."

Juror Su.C.: "I remember when this happened, but I don't remember any details or anything, because I'm not much of a—I'm not a news person. I do remember reading it, but nothing stuck with me.... I don't listen to the news [and] I don't watch the news on TV.... I remember when it happened.... I remember the news saying that they had found a body. I remember the [victim's] name; the name stuck with me. [But] I didn't remember Mr. Harmon's name. It didn't ring a bell with me until yesterday, when I read it on the [jury] questionnaire.... I remember it happened in Tenakee; I remember [that] the Tenakee people were very concerned."

Juror L.H.: "I remember the general ... situation, but it's been some time, so the details are somewhat vague in my mind at this point.... Boy, it's been some time [since] that coverage was taking place, and mainly—the fact that they had—you know, first of all, that this young woman was missing, and then the fact that, you know, she was found, ... and that, you know, ... some time had passed before they found the suspect. So that was—that's mainly about it.... I seem to recall that ... her body was found somewhere in the woods, I think, not too far from where she had lived, perhaps. And that ... there was a time before they had arrested anyone in the case."

Juror Ma.M.: "I read something about a girl [who] was missing, and then I read something about when they found her, and then I think something about when they arrested somebody for it." *Q:* "Do you remember any details?" *A:* "Not really. I don't subscribe to the paper, so I don't read it every day.... I don't remember any big details other than possibly they were searching for her for a long time and couldn't find her. I remember that, but that's really about all I remember about all of it."

Juror N.L.: "You know, [I remember reading an article] right when it first happened, and all I remember is that a woman's body was discovered, and that they thought maybe she had been jogging, ... and that she was attacked. That's really all I remember."

Juror A.W.: "We do get the Juneau Empire daily, and I have read about the case. I remember reading about the person that was missing, and I remember reading about somebody being arrested. But as far as details, I don't remember a lot of details.... About the only thing I can remember is the person was missing and they didn't find her for a while. And eventually [they] did, and it was a while before someone was arrested. But not a lot of other details.... I just remember there was an arrest. [But] how it happened, or where, I don't have any idea."

Juror S.H.: "I can't say that I read a whole lot about [the case]." In her pre-trial questionnaire, S.H. wrote that she remembered that "[the] body [was] found in Tenakee; [the] defendant was [the] boyfriend of [the] victim at times; [the] defendant went to school in Ketchikan; [and the] victim worked at Rainbow Foods".

Juror M.S.: "Well, what was it? A year—I don't even remember how many years ago it was. A couple years ago, was it? Or a year ago? I just heard ... on the news that it had happened.... There was a girl missing. And they couldn't find her. And then I heard that they did find her and suspected that it was murder. And basically, you know—basically, ... that's all I know, really."

Juror Pe.M.: "What I understand is that [M.W.] lived in Tenakee and she was found behind a building. I'm not sure of the exact amount of time—a few days later or weeks later. And Mr. Harmon was found in—on the way back up from California, and he was a suspect, I guess. And that's all I know."

Juror Pa.M.: "I recall reading about [M.W.], and that she'd worked here in Juneau at Rainbow Foods; that she was a young lady that spent ... part of her time in Tenakee and part here. I believe there was a long delay between the murder and finding the body. That's about all I can think [of]."

**22.** *Cheely*, 861 P.2d at 1169–1170.

**23.** *Id.* at 1170–73.

to trial first, and Gustafson was convicted just two weeks before Cheely's trial began.[24] At the conclusion of the jury selection process, Cheely asked the superior court for a change of venue, but that request was denied.[25]

On appeal, Cheely renewed his argument that the extensive pre-trial publicity made it impossible for him to get a fair trial in Anchorage, but this Court upheld the superior court's ruling.

We agreed with Cheely that, because of the intense pre-trial publicity, his motion for change of venue was governed by the *Mallott* standard. However, after reviewing the record, we concluded that Cheely's trial judge had not abused his discretion when he denied the request for a change of venue:

> Under *Mallott*, when prospective jurors have been exposed to intensive, prejudicial pre-trial publicity, judges need not take those jurors' protestations of impartiality at face value. However, as the facts of *Mallott* illustrate, no change of venue is required when, despite the dissemination of pre-trial publicity, a substantial portion of the prospective jurors have not been exposed to the publicity or, at least, not exposed to its prejudicial aspects. In *Mallott* itself, the supreme court upheld the trial court's refusal to change venue because it appeared, from individual voir dire, that, despite potentially prejudicial pre-trial publicity, more than half of the prospective jurors—and all but two of the jurors ultimately selected to try the case— had not been exposed to the worst aspects of that publicity and had heard only a basic description of the alleged crime. [*Mallott*,] 608 P.2d at 748.

*Cheely*, 861 P.2d at 1175.

The questioning of the prospective jurors in Harmon's case yielded results similar to the results described in *Mallott*. Of the seventy-five prospective jurors who came to court and were subjected to individual questioning, twenty-four had essentially no knowledge of the media coverage, and thirty-four had read or heard only a basic descrip-

tion of the alleged crime. In other words, a substantial majority of the seventy-five prospective jurors knew nothing about the evidence linking Harmon to the homicide—and, in particular, nothing of what Harmon had purportedly said to an undercover trooper.

In *Cheely*, we noted that the superior court and the parties were aware of the pre-trial publicity problem from the beginning, and that "they therefore engaged in probing, individual questioning of the prospective jurors, aided by an extensive pre-voir dire questionnaire that each prospective juror filled out before coming to court" [26]—in other words, the same procedure that was followed in Harmon's case.

As we noted in *Cheely*, the result of this probing jury selection process was that

> only one member of the jury panel knew much more about the case than a general description of the crime. Several members of the jury were not aware of the allegations against Cheely until they heard the indictment read in court at the beginning of the selection process. And ... many other prospective jurors were equally untainted by pre-trial publicity. The great majority of Cheely's peremptory challenges (9 of 11) were exercised against prospective jurors who had no more exposure to pre-trial publicity than the twelve jurors ultimately selected.

*Cheely*, 861 P.2d at 1175.

These same things are true in Harmon's case. Several members of Harmon's jury "were not aware of the allegations against [him] until they heard the indictment read in court", and the remaining jurors "[did not know] much more about the case than a general description of the crime". Only one member of the jury, Juror Ju.L., knew that Harmon had made statements before his arrest, and Ju.L. was unaware of the nature of these statements or that these statements had been made to an undercover trooper. Finally, as in *Cheely*, the majority of Harmon's peremptory challenges "were exercised against prospective jurors who had no

---

**24.** *Id.* at 1170 & 1172–73.

**25.** *Id.* at 1170 & 1174.

**26.** *Id.* at 1175.

more exposure to [the] pre-trial publicity than the [sixteen] jurors ultimately selected".[27]

Because decisions regarding a proposed change of venue are based on a weighing of competing factors (some of them intangible), and because there are often times when reasonable judges might come to differing conclusions based on the same underlying facts, an appellate court uses an "abuse of discretion" standard when it reviews a trial judge's decision regarding a proposed change of venue.[28]

Despite the intense pre-trial publicity surrounding this case, Judge Stephens could reasonably conclude—based on the process and the results of the jury selection—that the jurors ultimately selected to decide Harmon's case did not harbor unrevealed prejudices against Harmon. We therefore find that Judge Stephens did not abuse his discretion when he denied Harmon's motion for a change of venue.

*The admissibility of evidence pertaining to Harmon's earlier assault on M.W.*

■ As explained above, M.W.'s friend, D.W., witnessed Harmon attempting to sexually assault M.W. after a party on New Year's Eve 2002–03. One of the counts of the indictment (Count VI) charged Harmon with this attempted sexual assault.

In the superior court, Harmon's attorneys argued that the trial of this count should be severed from the trial of the other counts, and that evidence of this crime should not be presented at Harmon's separate trial on the murder and sexual assault charges arising from the events of late March 2003. Judge Stephens rejected these arguments. He agreed with the State that evidence of Harmon's earlier assault on M.W. was relevant to the issues of motive and, thus, identity— i.e., this evidence tended to prove that Harmon was the person who attacked M.W. in late March 2003. The judge concluded that, even if Harmon were tried separately for the March 2003 crimes, evidence of Harmon's New Year's Eve attempted sexual assault would be admissible at trial. Accordingly, Judge Stephens declined to order a separate trial on this count of the indictment.

(Judge Stephens did, however, grant Harmon's motion to sever the trial of Count VII of the indictment—the count that charged Harmon with attempting to sexually assault D.W. later that same evening (New Year's Eve 2002–03). The State ultimately dismissed this count of the indictment.)

On appeal, Harmon challenges Judge Stephens's conclusion that the evidence of the New Year's Eve assault of M.W. was admissible at Harmon's murder trial.

When the government proposes to introduce evidence of a defendant's other crimes, two questions must be answered. First, is the proposed evidence relevant for a non-propensity purpose? If the evidence has no relevance other than to prove propensity, it is barred by Alaska Evidence Rule 404(b)(1). Second, assuming that the evidence is relevant for one or more non-propensity purposes, is the probative value of the evidence outweighed by its potential for unfair prejudice? If so, then it should be excluded under Alaska Evidence Rule 403.

We agree with Judge Stephens that there was a plausible non-propensity relevance for the challenged evidence. The State was not relying simply on evidence that Harmon had sexually assaulted another woman in the past. Rather, the State's evidence tended to prove that Harmon had earlier assaulted the same woman, M.W., and that this sexual assault was interrupted by a bystander. These circumstances tended to prove Harmon's identity as the one who attacked M.W. twelve weeks later.

(As noted above, Judge Stephens excluded evidence of Harmon's contemporaneous sexual assault on M.W.'s friend, D.W., because

---

27. Harmon exercised a total of twelve peremptory challenges. Of these, five were exercised against prospective jurors who had no prior knowledge of the case: Jurors L.C., C.L., J.J., Al.M., and Jo.L. Three more of Harmon's peremptory challenges were exercised against pro-

spective jurors who knew only the basic facts of the case: Jurors H.D., D.S.W., and Am.M.

28. *Cheely,* 861 P.2d at 1175; *Newcomb v. State,* 800 P.2d 935, 937 (Alaska App.1990).

the judge concluded that this second assault had no plausible non-propensity purpose.)

Turning, then, to the weighing of probative value versus potential for unfair prejudice under Evidence Rule 403, Harmon argues that the probative value of this evidence was weak and its potential for unfair prejudice great. But Harmon's arguments are premised on viewing the evidence in the light most favorable to him; he accentuates the arguable weaknesses in the evidence, and he downplays its probative force.

The weighing of probative value versus potential for unfair prejudice is the type of decision where reasonable judges can (and do) differ. For this reason, an appellate court's review of these decisions is conducted under an "abuse of discretion" standard. We are to uphold the trial judge's assessment unless we are convinced that the trial judge's decision is "clearly untenable or unreasonable".[29]

In Harmon's case, Judge Stephens carefully assessed the challenged evidence using the balancing test prescribed by Evidence Rule 403, and he concluded that the evidence should be admitted. After reviewing the record, we conclude that his decision does not constitute an abuse of discretion.

*Harmon's sentence*

■ At the conclusion of Harmon's trial, the jury was unable to reach a verdict on the most serious charge contained in the indictment, first-degree murder, but the jury convicted Harmon of the remaining charges: second-degree murder, first-degree sexual assault, second-degree theft, and attempted first-degree sexual assault.

Based on forensic evidence that M.W. sustained substantial physical trauma during the March 2003 attack, Judge Stephens concluded (1) that Harmon attacked M.W., (2) that she tried to fight him off, and (3) that Harmon then intentionally killed her by strangling her. In other words, Judge Stephens concluded that, as a factual matter, Harmon

committed a first-degree murder, and thus his conduct was among the most serious included within the definition of second-degree murder.

Judge Stephens also noted other disturbing aspects of Harmon's behavior. After he raped and killed M.W., and while the community of Tenakee Springs was looking for her, Harmon took up residence in M.W.'s cabin, ate her food, and used her money to play poker.

Based on these factors, Judge Stephens concluded that Harmon's sentence should exceed the *Page* benchmark range of 20 to 30 years to serve for a first felony offender convicted of second-degree murder.[30] The judge sentenced Harmon to serve 65 years in prison for this offense. The judge imposed a concurrent sentence of 10 years in prison for the accompanying sexual assault (the March 2003 assault). The judge imposed a total of 7 consecutive years for Harmon's two other offenses (the theft and the New Year's Eve attempted sexual assault). Thus, Harmon's composite sentence is 72 years to serve.

On appeal, Harmon challenges Judge Stephens's finding that Harmon acted with an intent to kill when he strangled M.W. Harmon argues that this conclusion is "overly speculative", because some strangulation deaths can be unintended, and because even an intended strangulation death can sometimes be mitigated (by heat of passion, for example).

The question of Harmon's mental state when he killed M.W. is an issue of historical fact. Accordingly, we must uphold Judge Stephens's finding that Harmon intended to kill M.W. unless that finding is shown to be clearly erroneous.[31] In this case, Judge Stephens's finding is amply supported by the evidence. We also note, as Judge Stephens did, that there is absolutely no evidence that M.W. engaged in any conduct that would amount to legal provocation sufficient to trigger a heat of passion defense. In sum, we uphold Judge Stephens's conclusion that

---

**29.** *Gonzales v. State,* 691 P.2d 285, 286 (Alaska App.1984).

**30.** *Page v. State,* 657 P.2d 850, 855 (Alaska App. 1983).

**31.** *See Nelson v. State,* 68 P.3d 402, 406 (Alaska App.2003).

Harmon (as a factual matter) committed first-degree murder.

Harmon also challenges Judge Stephens's conclusion that Harmon's potential for rehabilitation was poor. Harmon points out that he is a relatively young first offender, with no prior criminal record, and that various people who knew him attested that he has a "gentle nature" and that "these crimes [are] wholly uncharacteristic [of him]".

It is true that Harmon has no prior record. And, as Judge Stephens acknowledged in his sentencing remarks, Harmon received the support of family members and friends. But Judge Stephens noted other, more troubling aspects to Harmon's life history. Harmon had never had a permanent job, and (in Judge Stephens's words) he "kind of bounced back and forth" between Ketchikan, Juneau, Tenakee Springs, and Colorado. Harmon enlisted in the military, but he lasted only one month before being discharged for repeatedly provoking fights and failing to adapt. In addition, as noted above, Harmon moved into M.W.'s cabin after he killed her, and he proceeded to eat her food and spend her money—conduct that Judge Stephens characterized as "profoundly disturbing as far as [evaluating] Mr. Harmon as a person [and] his prospects for rehabilitation".

The question on appeal is whether Judge Stephens's sentencing decision is clearly mistaken.[32] After examining the sentencing record as a whole, we conclude that Judge Stephens was not clearly mistaken when he imposed a sentence of 65 years' imprisonment for the offense of second-degree murder, and a composite sentence of 72 years to serve for all of Harmon's crimes.

*Conclusion*

The judgement of the superior court is AFFIRMED.

### ORDER ON REHEARING

The Appellant, James Harmon, has petitioned this Court for rehearing. He notes (correctly) that our decision in his case, *Harmon v. State*, 193 P.3d 1184, fails to address one of his claims on appeal.

This claim arose because the jury convicted Harmon of second-degree murder but was unable to reach a verdict on the more serious charge of first-degree murder. The State announced that it would defer any decision whether to re-try Harmon for first-degree murder until the State knew whether Harmon's second-degree murder conviction was insulated from attack, either on direct appeal or in post-conviction relief proceedings.

██ Harmon claims that, under Alaska's speedy trial rule (Criminal Rule 45), it is unlawful for the State to withhold its decision on this issue, or to make its decision contingent on the result of Harmon's efforts to overturn the second-degree murder conviction. Harmon's speedy trial claim is moot in one respect and unripe in another.

The claim is moot with respect to the possibility that Harmon's conviction for second-degree murder might be overturned on appeal—because this Court has now affirmed Harmon's conviction. The claim is not ripe with respect to the possibility that Harmon's conviction might be overturned in post-conviction relief litigation—because Harmon has not sought post-conviction relief.

Harmon argues that, even though he has not filed an action for post-conviction relief, the speedy trial issue is nevertheless ripe for decision because the State's announced position on this matter might deter Harmon from seeking post-conviction relief. We are unpersuaded by this argument. We note that the State's position on this matter did not deter Harmon from challenging his second-degree murder conviction on direct appeal.

In sum, we conclude that we need not decide at the present time whether the State is entitled to defer for so long its decision whether to re-try Harmon for first-degree murder.

---

**32.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (holding that an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).