Paul T. STAVENJORD, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7418.

Court of Appeals of Alaska.

March 28, 2003.

---

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

A jury selected for a trial in Palmer found Paul T. Stavenjord guilty of two counts of first-degree murder[1] for shooting Carl H. Beery and D.R. near Chulitna, a small, off-road community in the Matanuska Susitna Borough. Because this case generated substantial publicity, Stavenjord argues that the superior court erred when it denied his motion to change venue. But we have examined the record and conclude that the superior court did not abuse its discretion when it kept the trial in Palmer after conducting jury voir dire.

Stavenjord also argues that the superior court erroneously denied his motion to suppress evidence seized when the police execut-

ed several search warrants. Stavenjord renews his claim that the police intentionally or recklessly misstated material facts and intentionally or recklessly withheld material facts when applying for the search warrants. Because we conclude that the superior court did not abuse its discretion, we reject Stavenjord's argument. Accordingly, we affirm Stavenjord's convictions.

### Background facts

Beery and D.R. had a cabin in the Chulitna area of the Mat Su Borough. The Chulitna area is not on the road system but is accessible by foot or off-road vehicles. Beery and D.R. planned to spend the Memorial Day weekend of 1997 at their cabin. When D.R. did not return to work the following Tuesday, May 27, D.R.'s brother, Donald Tidwell, Jr., borrowed a four-wheeler and drove along the railroad tracks into the cabin. Tidwell found the couple's dogs at the cabin but no other sign of the couple.

Tidwell stopped at Stavenjord's nearby cabin to ask about D.R. and Beery. Stavenjord said that he and Beery had had a "falling out" and that he had not seen or talked to the couple in about a year. Nonetheless, he offered to help Tidwell look for them. By the next day, Wednesday, May 28, the troopers had been notified of the missing couple. Tidwell went to Pass Creek (about two miles north of Chulitna) when he heard that a green four-wheeler had been stuck in the creek since the previous Saturday. He recognized it as belonging to D.R.

The next day, Thursday, May 29, Beery's body was recovered from Pass Creek near the stuck four-wheeler. D.R.'s body was located a week later hidden in the bushes less than 150 feet away. Forensic examination found semen consistent with Stavenjord's DNA on D.R.'s body. Each victim was killed by a gunshot to the head with a small caliber weapon: Beery was shot with a .22 caliber bullet; D.R. was likely shot with a .22 caliber bullet. Ultimately, the grand jury indicted Stavenjord on two counts of first-degree murder, one count of first-degree sexual as-

---

1. AS 11.41.100(a)(1)(A).

sault,[2] and two counts of second-degree theft.[3]

At trial, Stavenjord claimed that he shot Beery in self-defense after Beery discovered that he was having consensual sex with D.R. and opened fire at Stavenjord. Stavenjord asserted that D.R. was accidently shot by Beery during the gunfight. The jury convicted Stavenjord of the two counts of first-degree murder and acquitted him of the other charges. Superior Court Judge Eric Smith imposed consecutive 99–year terms.

*Did the superior court properly uphold the challenged search warrants?*

As Judge Smith noted, the parties filed a "plethora" of motions that he resolved before trial. In this appeal, Stavenjord challenges the superior court's resolution of one of those motions: Stavenjord's claim that the testimony in support of several search warrants included intentional or reckless misstatements of fact and intentional or reckless omission of material facts such that the evidence seized when the warrants were executed must be suppressed.

On June 10, Alaska State Troopers Michael Brandenburger and Martin Patterson sought search warrants for Stavenjord's person, cabin, and vehicles. The troopers focused on Stavenjord as a potential suspect after they decided that a camper, who had been camping close to the area where D.R.'s four-wheeler and the bodies were found, was not a prime suspect. Both troopers testified in support of the warrant applications before Magistrate David L. Zwink and the court issued the search warrants.

When the troopers executed the warrants, they seized evidence including two .22 caliber rifles, three .22 caliber bullets found in a log near Stavenjord's cabin, writings by Stavenjord (which included an assertion of his whereabouts and activities on Memorial Day weekend), and hair samples and tissue swabs from Stavenjord's person.

In *State v. Malkin*,[4] the Alaska Supreme Court established the framework for evaluating a defendant's claim that an application for a search warrant included material misstatements or omissions.[5]

[O]nce a misstatement or omission is established, the burden of proving that it was neither reckless nor intentional shifts to the state. A failure to meet this burden will vitiate the warrant if the misstatement or omission is material, that is, if deletion of the misstated information from or inclusion of the omitted information in the original affidavit would have precluded a finding of probable cause. A non-material omission or misstatement—one on which probable cause does not hinge—requires suppression only when the court finds "a deliberate attempt to mislead [the magistrate]." [6]

The parties presented testimony at an evidentiary hearing before Judge Smith. Judge Smith entered findings and denied Stavenjord's motion.

Stavenjord's motion rested on two main pillars. First, Stavenjord claimed that the troopers deliberately misled Magistrate Zwink by misstating and omitting information that implicated the camper whom the troopers first suspected but had ruled out as a prime suspect before they sought the Stavenjord warrants. Second, Stavenjord claimed that the troopers misstated or omitted information that would have corroborated Stavenjord's statements about his whereabouts on May 23 and May 24.

The State argues that we should reject Stavenjord's arguments and uphold the search warrants based on evidence presented at the trial.[7] As the State points out, Staven-

---

2. AS 11.41.410(a)(1) & (2).

3. AS 11.46.130(a)(1) & (2).

4. 722 P.2d 943 (Alaska 1986).

5. *Id.* at 946 (citing *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

6. *Lewis v. State*, 862 P.2d 181, 186 (Alaska App. 1993) (quoting *Malkin*, 722 P.2d at 946 n. 6) (footnotes omitted).

7. *See Hubert v. State*, 638 P.2d 677, 680 n. 2 (Alaska App.1981) (noting that the "better reasoned" state cases follow well-settled federal law that "evidence presented at trial may be considered on appeal" when resolving a suppression issue).

jord admitted at trial that he was involved in the homicides. And Stavenjord admitted that his statements to the troopers about his whereabouts on May 23 and 24 were not true. Thus, Stavenjord's case at trial affirmatively supported the magistrate's decision to issue the search warrants. Basically, the troopers told the magistrate that their investigation had turned from the camper as a prime suspect to Stavenjord when they discovered that several of Stavenjord's statements about his whereabouts around the time of the homicides were false. But we need not uphold the warrants by considering the trial testimony because Judge Smith directly rejected Stavenjord's claims and we conclude that Judge Smith did not abuse his discretion when he denied this motion.[8]

Stavenjord could prevail on this claim only if the purported misstatements or omissions were intentional or were reckless and material to the issuance of the warrant.[9] During the evidentiary hearing that lasted several days, the parties litigated what information the troopers learned and when they learned that information. Judge Smith had a transcript of the testimony in support of the application for the search warrants. Judge Smith also observed Troopers Brandenburger and Patterson testify at the evidentiary hearing and, thus, was able to judge their credibility. After receiving all this testimony and evidence, Judge Smith found that the troopers had not sought to deliberately "mislead the magistrate." From our review of the record, we conclude the finding is not clearly erroneous.[10]

Because the troopers did not intentionally mislead the magistrate, Stavenjord would have to show that the troopers' misstatements or omissions were reckless and were material to a finding of probable cause.[11]

Of all the claimed misstatements and omissions, Judge Smith mentioned only two areas that might have risen to the level of a reckless misstatement or omission. First, the troopers did not tell the magistrate that Stavenjord's ex-wife had been interviewed and supported Stavenjord's claim about his whereabouts on the Sunday of Memorial Day weekend, May 25. But Judge Smith concluded these omissions were not material to the issuance of the warrant. The record supports Judge Smith's analysis. The thrust of the evidence the troopers presented to the magistrate to undercut Stavenjord's story of his whereabouts focused on Stavenjord's description of his movements on Friday, May 23, and Saturday, May 24. We agree with Judge Smith that these potentially reckless omissions were not material to a finding of probable cause because Stavenjord's whereabouts on Sunday were not particularly relevant.

Judge Smith also found that the troopers' failure to inform the magistrate that they had not seen evidence of a .22 caliber weapon when visiting Stavenjord's residence on June 1 might have been reckless, but not material. We agree. Trooper Patterson testified that he went to Stavenjord's cabin on June 1 to interview him and had not looked for anything in particular when he was there. Testimony that no evidence of a .22 caliber weapon was seen in Stavenjord's home on June 1 would not have undercut the other evidence supporting probable cause.

Judge Smith found no other claimed misstatement or omission to be reckless. And negligent omissions or misstatements are not included or excised from the warrant application.[12] But Stavenjord argues that the other misstatements and omissions were reckless.[13]

**8.** See State v. Bianchi, 761 P.2d 127, 130 (Alaska App.1988).

**9.** See Malkin, 722 P.2d at 946.

**10.** See Blank v. State, 3 P.3d 359, 365 (Alaska App.2000).

**11.** See Malkin, 722 P.2d at 946.

**12.** Id. at 946–47.

**13.** The argued misstatements and omissions comprise several discrete areas: the camper's

observation of smoke coming from Stavenjord's cabin on May 23; the whereabouts of the camper in the Chulitna area during the Memorial Day weekend; underwear seen near the camper's Pass Creek campsite; the camper's background and record and other areas that might direct suspicion on the camper; gray fibers found near D.R.'s body and the similarity of those fibers to an article of the camper's clothing; receipts obtained from the Igloo, a business at which Stavenjord said he made some purchases while he was away from Chulitna on Memorial Day week-

A finding that a trooper recklessly omitted or misstated facts contains both subjective and objective components because a person who acts recklessly disregards a substantial and unjustifiable risk despite the subjective awareness of the risk.[14] Judge Smith observed the testimony of both troopers who appeared before the magistrate and was in a position to evaluate their credibility when deciding whether either trooper was subjectively aware of the risk of a purported misstatement or omission. Except for the specific instances discussed above, Judge Smith made no such finding regarding the other areas advanced by Stavenjord.

We have examined the record to evaluate Stavenjord's remaining claims. Judge Smith found in some instances that the troopers did not misstate or omit information or, by implication, that the misstatement or omission was negligent. Based on our review, the record supports Judge Smith's findings. Accordingly, we conclude that Judge Smith did not abuse his discretion when he denied the motion to suppress that was based on Stavenjord's *Malkin* claim.

■ In the superior court, Stavenjord also argued that the troopers "judge shopped" when they applied for the search warrants before Magistrate Zwink and not District Court Judge Peter Ashman, the judge who had considered and issued all warrants in the case before June 10. But Judge Smith made no specific findings on this claim. Because Stavenjord did not press the court for a ruling on this issue, this claim is not preserved.[15] We express no opinion on whether the police had a duty to seek all search warrants from Judge Ashman.

*Did the superior court properly deny Stavenjord's motion to change venue?*

The media serving the Mat Su area, consisting of newspapers in Anchorage and the Mat–Su Valley, Anchorage television stations, and those radio stations in the region which provide local news, provided intense coverage of the case following the discovery of Beery's body. The coverage included favorable descriptions of D.R. and Beery, portraying them as happily-married and well-liked. On Saturday, June 14, the day after the district court issued a warrant for Stavenjord's arrest, the troopers announced the beginning of their search for Stavenjord as a suspect. A manhunt ensued and lasted until Stavenjord turned himself in on July 13. Over fifty stories broadcast on television and over a dozen published newspaper stories, often on the front page, reported the manhunt. The publicity receded after Stavenjord surrendered in July, but coverage returned in October during pre-trial hearings. Stavenjord moved to change venue on the basis of the publicity the case generated. Judge Smith denied the motion but indicated that Stavenjord could renew the motion during jury selection or after it was complete.

■ In *Mallott v. State*,[16] the Alaska Supreme Court adopted the recommendation of the American Bar Association on the standards to apply when considering a motion to change venue in a case that has had substantial pre-trial publicity:

A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required.[17]

This standard effectively relieves a party from the burden of demonstrating actual

---

end; Stavenjord's purported meal at the Perch, a restaurant in the Denali Park area; Stavenjord's whereabouts during the Memorial Day weekend; Stavenjord's use of a four-wheeler on May 24; Stavenjord's "refusal" to voluntarily provide hair and blood samples; and "bad blood" between Stavenjord and Beery.

**14.** *See* AS 11.81.900(a)(3) (defining "recklessly"); *Davis v. State*, 766 P.2d 41, 45 (Alaska App.1988).

**15.** *See Taylor v. Johnston*, 985 P.2d 460, 467 (Alaska 1999); *Russell v. State*, 934 P.2d 1335, 1340–41 (Alaska App.1997); *Marino v. State*, 934 P.2d 1321, 1327 (Alaska App.1997); *Erickson v. State*, 824 P.2d 725, 733 (Alaska App.1991).

**16.** 608 P.2d 737 (Alaska 1980).

**17.** *Id.* at 748.

prejudice in the panel.[18]

■ The *Mallott* court also adopted the ABA standards for the acceptability of a juror who has been exposed to pre-trial publicity:

"[a] prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind." [19]

■ Under this standard, a juror who claims not to be unable to set aside preconceptions developed about the case must be excused.[20] Also, a juror who has been exposed to material that is highly inflammatory or highly incriminating must be excused even if the juror claims impartiality because such a claim is considered suspect.[21] On the other hand, jurors are not automatically disqualified if they have some knowledge of the facts of the case or an opinion on the case that is not based on exposure to inadmissible evidence or other highly inflammatory material. Instead, the trial court must base its decision on the credibility of the juror if the juror claims impartiality.[22]

The vast majority of the coverage throughout the history of the case focused on the underlying facts. However, some coverage discussed information that was facially inadmissible. The information included: (1) that Stavenjord had been expelled from school for calling African Americans "coons," (2) that as a juvenile he had been arrested five times— once for armed robbery of a liquor store— and had been incarcerated for two years, (3) that he had threatened to kill himself with a gun, (4) that he had escaped from juvenile prison and led police on a high speed car chase, (5) that he had committed an armed bank robbery in Seward in 1971, (6) that after the Seward robbery, he fled into the mountains but was caught two days later, and (7) that he had attempted to rob the bank in order to support his drug habit. However, an article that described all this information also had a large section entitled "A Changed Man" which chronicled Stavenjord's life from 1976 forward. The section portrayed Stavenjord as a reformed man, a craftsman living in the Bush.

Once court proceedings began, television and newspapers reported on the pre-trial motions, the amount of his bond, whether he would wear leg restraints in the courtroom, and the jury selection process.

Jury selection began on March 20, 1998. Prospective jurors were given written questionnaires to complete. After completing the questionnaires, the court allowed individual voir dire of each prospective juror (outside the presence of the other potential jurors), primarily about each person's knowledge of the case. Out of the 184 potential jurors questioned in this initial phase, 60 potential jurors were passed for cause, 47 were excused for case-related reasons, and the balance were excused for reasons unrelated to the case.

The court then proceeded with additional questioning of those passed in the initial phase. No juror was challenged for cause related to publicity during this phase of jury selection. Stavenjord challenged two jurors for cause unrelated to publicity, but the court denied those challenges and Stavenjord excused them with peremptory challenges. By the end of jury selection, Stavenjord exercised his normal ten peremptory challenges, four additional peremptory challenges granted him by the court, and four peremptory challenges as to alternate jurors. Jury selection lasted through ten court days; the tran-

---

18. *See Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 360 (Alaska 1996); *Mallott*, 608 P.2d at 748.

19. *Id.* at 749, citing ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, § 8–3.5(b) (Approved Draft 1978).

20. *See Nelson v. State*, 781 P.2d 994, 997 (Alaska App.1989); *Arnold v. State*, 751 P.2d 494, 500 (Alaska App.1988).

21. *Id.*

22. *See Mallott*, 608 P.2d at 749–50.

script for those ten days is over two thousand pages. Jury selection ended on April 7.

The record shows that twenty-six jurors were excused for cause because of exposure to pre-trial publicity. Another ten jurors were excused for cause because they were familiar with Beery, D.R., Stavenjord, or members of their families. Eleven jurors were excused for cause because of exposure to publicity and other factors including personal hardship. Sixteen jurors were eventually selected—twelve plus four alternates. During trial, three jurors were excused: two for personal reasons unrelated to the case, and one after the juror notified the court that she recalled reading or hearing something about Stavenjord's robbery conviction. The remaining alternate was excused before the jury deliberated.

At the end of jury selection, Stavenjord renewed his change of venue motion. Because of the number of jurors who were excused based on exposure to publicity or knowledge of the families involved in the case, Judge Smith reasoned that he had to apply the "substantial likelihood" test set out in *Mallott.* Judge Smith denied the motion after analyzing the nature and timing of the publicity, including the inadmissible evidence published, the size and character of the community, the venire's ties to the parties involved, and the responses of those who were actually chosen to serve on the panel.

■ The question facing a court when there is intensive pre-trial publicity is whether there is substantial reason to doubt the impartiality of the jurors who remained after the selection process was complete,[23] or stated another way, what is the likelihood that, despite voir dire, the jury panel "harbor[s] unrevealed prejudices as a result of the publicity."[24]

■ In Stavenjord's case, the attorneys and Judge Smith recognized the issues raised by the pre-trial publicity. Before individual voir dire, the court had each potential juror answer a long questionnaire that included several questions about media exposure, what the juror learned about the case (whether through the media or personal contacts), and whether the juror knew any of about 200 people who might be mentioned in the case or called as a witness. The court then allowed individual voir dire of each juror.

The jury panel of twelve and the four alternates selected included ten who remembered only the bare allegations of the State's case, four who knew details about the participants in the case, had interests in the location of the homicides, or had heard about Stavenjord's disappearance, and two who had not heard about the case. But all these jurors expressed confidence that they could be impartial. None of the selected jurors personally knew any of the parties involved in the trial, and at the end of jury selection, none recalled any of the inadmissible evidence about Stavenjord. The trial began April 13, 1998, more than eight months after the end of the manhunt and continued into the first week of June. However, during trial, one of the jurors remembered Stavenjord's involvement in a robbery. The juror notified Judge Smith and she was excused from service.

In summary, most jurors knew only the bare details of the crimes the State alleged. Of those who remembered more detailed information, none of the information recalled was of an inflammatory or prejudicial nature. And many other potential jurors who did not serve on Stavenjord's jury did not recall more than the fact of the homicides and Stavenjord's disappearance. Even though there was substantial pre-trial publicity, it is apparent that in an area as physically large as the Mat Su area, considering the size of its population, many people were not influenced by the media coverage.[25]

**23.** *See Cheely v. State,* 861 P.2d 1168, 1174 (Alaska App.1993).

**24.** *Mallott,* 608 P.2d at 748.

**25.** According to the 2000 census, the Matanuska–Susitna Borough is the third largest population area in the state. Information for Alaska from the 2000 census is available on the state website by accessing http://www.library.state.ak.us/asp/statestatistics.html and clicking on Census 2000 Data for Alaska or on the U.S. Census Bureau website by accessing http://quickfacts.census.gov/qfd/states/02000.html.

Because a trial judge is in the best position to evaluate the conduct and results of jury selection, we affirm the superior court's denial of the motion for change of venue unless we are convinced, after our own independent review of the record, that the superior court abused its discretion.[26] Based on the proceedings in this case, which we have summarized above, Judge Smith could reasonably conclude that the pre-trial publicity complicated jury selection, but that the jurors ultimately selected did not conceal latent prejudices about the case that threatened Stavenjord's right to a fair trial.

Therefore, we conclude that Judge Smith did not abuse his discretion when he denied Stavenjord's motion to change venue.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

**26.** *See Newcomb v. State,* 800 P.2d 935, 937 (Alaska App.1990).