Gregory T. LESTENKOF, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10007.

Court of Appeals of Alaska.

April 23, 2010.

Brian T. Duffy, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Tamara de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

■ This case involves the competing values protected by the constitutional guarantee that a criminal defendant must have an "impartial jury." [1] The jury venire must include a "fair cross section" of the community in which the alleged offense occurred. [2] In addition, the individual jurors may not be biased by their relationships to the parties or their knowledge of the dispute. [3] These values sometimes become difficult to balance when a jury trial is scheduled in a small town or village. In the current case, we conclude that the superior court properly balanced these competing values by making a reasonable, diligent attempt to seat a jury in the small community of Saint Paul before moving the trial to Dillingham.

## Factual And Procedural Background

Saint Paul is a small community located on St. Paul Island in the Bering Sea. During the early morning hours of June 3, 2006, Carol Melovidov and her boyfriend, Gregory T. Lestenkof, engaged in heavy drinking, ending up at the home they shared. When Melovidov's son returned from Anchorage on June 4, Lestenkof physically prevented him from seeing his mother. This made him suspicious, so he waited in the hallway until his mother emerged late that night to use the bathroom. When the son saw his mother, he noticed that her face was "all swollen purple" and that she had two black eyes.

Melovidov was eventually taken to the village clinic and then transported to Anchorage, where doctors at the Alaska Native Medical Center discovered that she had life-threatening bleeding in her brain. On June 19, 2006, Lestenkof was indicted on one count of second-degree assault for recklessly causing serious physical injury to Melovidov. [4]

Superior Court Judge William F. Morse traveled to Saint Paul for jury selection. Judge Morse faced numerous problems in his attempts to obtain a jury, however, and most potential jurors were excused for cause due to knowledge of the facts of the case, relationships to Lestenkof or Melovidov through blood or marriage, work commitments, or a professed inability to be impartial in the case. On the fourth day of jury selection, only

---

1. U.S. Const. amend. VI; Alaska Const. art. 1, § 11.

2. *Alvarado v. State,* 486 P.2d 891, 902–03 (Alaska 1971).

3. *Oxereok v. State,* 611 P.2d 913, 918–19 (Alaska 1980).

4. AS 11.41.210(a)(2).

eleven unexcused jurors remained in the trial panel; all of the other prospective jurors had been excused.

Lestenkof requested a special venire, and suggested that additional prospective jurors could be flown in from Saint George, a village on another island. Judge Morse determined that the only way to bring jurors from Saint George would be to "commandeer the PenAir flight," which did not arrive until the next day, and that this was not "a viable option." Judge Morse stated that "[i]n terms of locating additional ... jurors who are not on the original list, I'm not sure if that's possible." Later that day, Judge Morse stated that he had "obtained from Anchorage a list of the ... 2005 jury list" and that "there were three or so new names on it." The court contacted two of the three potential jurors, and noted that the third juror had a prior criminal conviction that disqualified him from serving.

Judge Morse ultimately decided that he would not "deviate from the [selection] procedure that resulted in the master jury list." He stated "I don't know why it was ninety [names]—whatever our list was, and some other number at some other time.... I'm not going to canvass the community seeking additional jurors." Based on the apparent impossibility of seating a jury in Saint Paul, Judge Morse determined that "the [only] alternative [was] to change venue." According to Judge Morse, "[t]he likely [alternative venue] would be Unalaska rather than any other community, since [it] is closest and it's sort of [the same] socioeconomic makeup [as] Saint Paul."

At a status hearing after the jury had been released, Lestenkof raised an argument based on *Batson v. Kentucky*[5]: He argued that the State had used its peremptory strikes for the purpose of ensuring that a jury would not be seated in Saint Paul, and that the trial would be moved to a demographically different location. Lestenkof requested that the State provide race- and gender-neutral reasons for its peremptory strikes. After the parties provided briefing on the issue, Judge Morse denied Lestenkof's *Batson* claim. Judge Morse determined that the State had not used the peremptory challenges intending to "deny Lestenkof a trial by a jury of the [same] racial or socio-economic makeup as that of the ... jurors that were selected or of the jury venire or of the population of Saint Paul." Judge Morse set a tentative trial date for Unalaska, and transferred the case to Superior Court Judge Fred Torrisi.

At a status hearing before Judge Torrisi, Lestenkof argued that Unalaska was an improper venue. Lestenkof argued that if the court would not return venue to Saint Paul, then it should be moved from Unalaska, because it was "not a similar community to Saint Paul." Judge Torrisi suggested that Dillingham would have more Alaska Native representation than Unalaska. Lestenkof's trial was transferred to Dillingham, where a jury convicted him of assault in the second degree. He now appeals.

### Judge Morse Undertook Reasonable Efforts to Empanel a Jury in Saint Paul

A trial judge has a great deal of discretion in determining what efforts should be undertaken to obtain a jury in a rural area.[6] We will, therefore, uphold a trial court's decision where it is clear that the court "has weighed the different possibilities for supplementing a jury and made a reasonable, diligent attempt to obtain a jury."[7]

In Lestenkof's case, the record reveals that the trial court made considerable efforts to empanel a jury in Saint Paul. For four days, Judge Morse and the parties attempted to select a jury from the names contained on the 2006 St. Paul Island "Master List." This master list contained 100 printed names and two names added in handwriting.

---

5. 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986) (requiring the State to provide a "clear and reasonably specific" racially neutral explanation for a peremptory challenge once the defendant makes a prima facie showing of racial discrimination).

6. *See Erick v. State*, 642 P.2d 821, 825 (Alaska App.1982).

7. *Id.*

When a large number of the people on the list failed to respond to a summons, Judge Morse took steps to have a public service announcement read on the local radio station, encouraging the other prospective jurors to come to court. Judge Morse had the court clerk call the prospective jurors (those with telephones), and the clerk even enlisted neighbors to visit the homes of the prospective jurors to learn why the jurors were not reporting to court.

According to the handwritten record kept by the clerk, the result of all of these efforts was that about seventy percent of the prospective jurors appeared in court—sixty-eight of the 102 people listed on the St. Paul Island master list. However, because of challenges for cause, peremptory challenges, and court-granted excuses, these sixty-eight prospective jurors yielded only eleven qualified jurors.

At this point, Lestenkof made several suggestions to Judge Morse to try to complete the jury selection. Lestenkof first suggested that Judge Morse should revoke the State's eleventh peremptory challenge—the challenge that reduced the jury panel to eleven. He argued that the State was entitled to use only ten peremptory challenges for the regular jury panel and that the eleventh challenge could be used only for an alternate juror. Lestenkof renews this argument on appeal, contending that the State violated the procedures required by Alaska Criminal Rule 24(b).

*Peremptory Challenge Rulings*

■ Ordinarily, each party is entitled to ten peremptory challenges in a felony case.[8] Criminal Rule 24(b)(1)(B) provides that each side is entitled to one additional peremptory challenge if one or two alternate jurors are to be empaneled. Before jury selection, Judge Morse relied on this rule when he decided that the jury panel would include two alternate jurors and that each side would have a total of eleven peremptory challenges. Lestenkof agreed to this procedure. But Lestenkof now argues that the State's eleventh peremptory challenge violated Rule 24(b)(2)(A), which provides that "[t]he addi-

tional peremptory challenges allowed by section (b)(1)(B) may be used against an alternate juror only."

Lestenkof's argument is based on one of the alternative procedures for jury selection authorized by Criminal Rule 24(b). He is referring to the procedure described in Rule 24(b)(2)(A), where the court separately empanels designated alternate jurors in addition to the twelve-person panel. When a court uses this procedure, the additional peremptory challenges for alternate jurors may only be used to challenge alternate jurors.

But Judge Morse used a different procedure for Lestenkof's jury selection—an alternative procedure authorized by Rule 24(b)(2)(B). When the court employs this procedure, the court calls additional jurors to be added to the panel during jury selection without designating which jurors are alternate jurors. The alternate jurors are excused by random selection at the conclusion of the trial before the jury retires for deliberations. When the court uses this procedure, there is no limitation that the additional challenges be used for alternate jurors because the alternate jurors are not designated until the end of the trial. Lestenkof's objection to the State's eleventh peremptory challenge fails because his argument is based on a jury selection procedure that was not used in this case.

■ Lestenkof also asked Judge Morse to allow him to withdraw one of the peremptory challenges he had previously exercised. But, under Alaska law it is not clear whether a previously challenged juror who has been formally excused remains available for jury service.

We note that Criminal Rule 24(c)(8) declares that potential jurors are disqualified for cause if they were "excused ... peremptorily on a previous trial of the same action." Although we are not dealing with a retrial in Lestenkof's case, the underlying rationale of Rule 24(c)(8) would seemingly suggest that, once a juror is excused due to a party's peremptory challenge, the juror becomes le-

---

8. Alaska R.Crim. P. 24(d).

gally ineligible for any future service in that case.[9]

We further note that courts from other jurisdictions have recognized that trial judges have the discretion to deny parties' requests to withdraw peremptory challenges after those challenges have been effectively exercised.[10] Indeed, in *People v. McNeil*, the court held that the trial judge committed reversible error by allowing the prosecutor to withdraw two previously exercised peremptory challenges in order to complete jury selection from a venire that had been nearly exhausted.[11]

We do not intend to formally declare Alaska law on this issue. However, based on the foregoing authorities, we conclude that Judge Morse did not abuse his discretion when he rejected Lestenkof's request to rescind one of his previously exercised peremptory challenges.

### Reliance on the "Master Jury List"

■ Lestenkof also suggested that Judge Morse should summon a "special venire." In particular, he asked the judge to charter a flight to neighboring St. George Island to bring additional prospective jurors or to round up extra people from Saint Paul. Judge Morse declined to seek additional jurors that were not on the court's jury list.

Judge Morse's response was based on Alaska Administrative Rule 15, which defines the procedures for compiling the lists of prospective jurors for the various court locations around the state. Administrative Rule 15(b)(1) directs the administrative director of the court system to annually prepare a statewide "master jury list"—that is, a list of all prospective jurors in the State of Alaska. Rule 15(b)(2) then directs the administrative director to "divide the statewide master list into local master jury lists for each court location." According to Rule 15(b)(2), each local master list is to "include the names of all prospective jurors who live in [that] community and [the] other areas assigned to that court for jury selection purposes"—basically, all the smaller communities within a fifty-mile radius of the court location.

This understanding of Rule 15 clarifies Judge Morse's response when Lestenkof requested a special venire.

> *The Court:* If there were more jurors available in the pool that we could identify, I would bring them in here. But we have contacted everyone on those lists, and they're either off-island or not responding to phone calls and radio messages, public radio messages . . . .

> [With respect to your request that we simply call up another twenty or so people], I'm not sure that that's an appropriate thing to do . . . . I don't see anything in Administrative Rule 15 that permits me to do that . . . . [T]here is a provision [in that rule] that lays out how the master jury list is to be crafted; that procedure has presumably—I can only assume it's been followed . . . .

> I don't know why the list has the specific number [of names] that it has on it . . . . All I know is that the master list that was crafted annually pursuant to the rule. And . . . it produced the [group] of prospective jurors that are out there.

> I know that the rule includes a provision for . . . exclusion of people who request a change in the timing [of their jury service and] some other medical or other reasons. And I can only assume that [the rule] was followed. I don't see any authority that . . . I have to [go outside the master list].

Then, after more argument from the parties, Judge Morse concluded:

> I'm not going to deviate from the procedure [specified in Administrative Rule 15] that resulted in the master jury list. While I don't know the specifics, certainly the intent of [Administrative Rule]

9. *See Zartman v. State*, 667 P.2d 1256, 1257–58 (Alaska App.1983) (holding that the trial court committed reversible error by failing to excuse jurors who sat on a similar case the preceding week and heard similar witnesses).

10. *See United States v. Anderson*, 562 F.2d 394, 397 (6th Cir.1977); *Davis v. State*, 922 So.2d 454, 455 (Fla.App.2006); *Biddle v. State*, 67 Md. 304, 10 A. 794 (1887).

11. 39 A.D.3d 206, 834 N.Y.S.2d 99, 101–02 (2007).

[15](b)(2) is that the master list is to include the names of all prospective jurors.... [It] would be pure speculation on my part—I don't know why [our master list contained only] ninety [names] ... and [had] some other number [of names] at some other time. I just don't know. I'm not going to canvass the community seeking additional jurors.

In other words, Judge Morse relied on the procedures specified in Rule 15 for compiling the master list, and on the presumption of regularity—that is, the presumption that the master list did contain the names of all eligible prospective jurors residing in Saint Paul and the other communities within a fifty-mile radius.

The dissenting opinion suggests that there was a more extensive list of jurors available. But although Lestenkof's attorneys contended that more jurors were available, they did not present any evidence to support their claim. We therefore conclude that the record supports Judge Morse's finding that the master list contained all of the jurors who were available to serve in Lestenkof's trial.

Judge Morse's findings distinguish this case from the inadequate jury selection efforts that this court reviewed in *Erick v. State*.[12] In *Erick*, after the parties had exercised their peremptory challenges on the prospective jurors who had not been excused for cause, only seven jurors remained on the trial panel in Fort Yukon.[13] But the court system did not provide the trial judge or the local court clerk with the master list for the Fort Yukon area.[14] If the judge had used the master list, he could have summoned at least 437 additional jurors from the surrounding area.[15] Under these circumstances, the State had failed to meet its burden to show that it was not reasonable to obtain a jury of twelve from the Fort Yukon area.[16] This court noted that in *Calantas v. State*, the Alaska Supreme Court approved an emergency supplementation of the jury venire with additional names available from the master jury list when it became apparent that too few jurors would be available for a trial in Kodiak.[17]

In Lestenkof's case, however, the court exhausted all of the potential jurors available on the master list for the Saint Paul area. There were no additional jurors remaining on the master list who could be summoned. We accordingly conclude that the judge did not abuse his discretion when he declined to summon a special venire.

## Twelve-person Jury Requirement

■ Lestenkof also suggested that the State could stipulate to an eleven-person jury. In response, Judge Morse noted that the State had not agreed to such a stipulation. The dissenting opinion suggests that the court should have proceeded with an eleven-person jury, even without the State's consent.

However, Criminal Rule 23(b) requires the jury to consist of twelve persons, unless the parties stipulate in writing that the jury may consist of a number less than twelve. This rule requires the court to obtain the State's consent before reducing the jury to a number less than twelve. Both this court and the United States Supreme Court have held that the corresponding requirement in Criminal Rule 23(a)—the requirement that the State must consent to any waiver of jury trial—does not violate the defendant's right to due process.[18] Other courts have held that the prosecution must agree before a case may be tried to an eleven-person jury.[19]

12. 642 P.2d 821.

13. *Id.* at 823.

14. *Id.* at 824–25.

15. *Id.* at 825.

16. *Id.* at 824.

17. *Id.* at 826 (citing *Calantas v. State*, 599 P.2d 147 (Alaska 1979)).

18. *Singer v. United States*, 380 U.S. 24, 36, 85 S.Ct. 783, 790–91, 13 L.Ed.2d 630 (1965); *Horton v. State*, 758 P.2d 628, 629–30 (Alaska App. 1988).

19. *State v. Gorwell*, 339 Md. 203, 661 A.2d 718, 723–26 (1995); *State v. Romeo*, 43 N.J. 188, 203 A.2d 23, 29 (1964); *State v. McFerron*, 52 Or. App. 325, 628 P.2d 440, 443 (1981).

The dissenting opinion suggests that *Erick* holds that the trial court may require the prosecution to proceed with a jury of less than twelve. But *Erick* does not address this issue because the State in that case agreed to proceed with a seven-person jury.[20]

Lestenkof did not ask Judge Morse to proceed with the trial before an eleven-person jury without the State's consent. In view of the foregoing authority, we cannot conclude that the judge committed plain error when he declared a mistrial without requiring the State to proceed to trial with an eleven-person jury. Lestenkof not only failed to object when the judge noted that the State had not stipulated to trial before an eleven-person jury, he also waived this issue by his failure to raise it in this appeal.[21]

In summary, Judge Morse undertook considerable efforts to empanel a jury in Saint Paul. The additional steps that Lestenkof proposed were either legally questionable or factually unreasonable. We therefore conclude that Judge Morse did not abuse his discretion when he declared a mistrial.

### The Trial Court Had the Discretion to Order the Change of Venue

A jury should be representative of a fair cross section of the community where the alleged offense occurred.[22] But a superior court may change the venue for trial "when there is reason to believe that an impartial trial cannot be had."[23] Jury selection should generally be commenced in the venue location specified by Criminal Rule 18, and then moved only if voir dire reveals that an impartial jury cannot be obtained.[24]

The dissenting opinion suggests that a defendant has the right to a "home field advantage" if he has a good reputation in the community where the prosecution arises. But the fair-cross-section requirement derives from a defendant's constitutional right to "an impartial jury,"[25] not a right to an unfair advantage. By contrast, it would be particularly unfair to allow a jury in a small community to convict a defendant based on community knowledge about the defendant or the crime.[26] It would likewise be contrary to our system of justice to require the trial to be held in a venue where the jury cannot be fair to both parties.

The trial judge is in the best position to evaluate the jury selection he or she has conducted.[27] And because the judge must balance both tangible and intangible factors to decide whether to change the venue, "reasonable judges might come to differing conclusions based on the same underlying facts."[28] We therefore employ the abuse of discretion standard when we review a trial court's decision to grant a change of venue.[29]

In the present case, Judge Morse entered specific findings supporting his decision to change the venue based on what he had observed during the jury selection in Saint Paul:

**20.** *Erick,* 642 P.2d at 823.

**21.** See *Buckwalter v. State,* 23 P.3d 81, 88 (Alaska App.2001) (where a claim is inadequately briefed it is considered waived on appeal).

**22.** *Alvarado,* 486 P.2d at 902–03 ("The necessity for selection of juries from a source which truly represents a fair cross section of the community cannot be overemphasized.").

**23.** AS 22.10.040(1); *see also Mallott v. State,* 608 P.2d 737, 746 (Alaska 1980) (explaining that trial court should not fail to exercise the discretion conferred on it by AS 22.10.040(1) to change venue when there is reason to believe that an impartial trial cannot be had); *Oxereok,* 611 P.2d at 919 (finding the superior court's refusal to change venue after voir dire revealed that a large number of venirepersons were not impartial amounted to an abuse of discretion).

**24.** *Wylie v. State,* 797 P.2d 651, 656 (Alaska App. 1990).

**25.** See *Alvarado,* 486 P.2d at 896 (citing U.S. Const. amend. VI, Alaska Const. art. I, § 11).

**26.** See *Titus v. State,* 963 P.2d 258, 262 (Alaska 1998) (explaining that pre-existing knowledge about a case or a defendant can constitute extraneous prejudicial information).

**27.** *Stavenjord v. State,* 66 P.3d 762, 770 (Alaska App.2003).

**28.** *Harmon v. State,* 193 P.3d 1184, 1200 (Alaska App.2008).

**29.** *Id.*

The Court can perceive little likelihood that a jury can be seated on Saint Paul. The alleged event that underlies the criminal charge was the topic of much discussion on the island. Both Lestenkof and the alleged victim are well-known on the island. Many residents are related by birth and/or marriage to either or both of them. The attempt to seat a jury caused additional discussion on the island and reduced the chance of selecting a jury.

These findings are supported by the record of the jury selection.

These circumstances are similar to the challenges the Dillingham court faced in *Nickolai v. State*.[30] In *Nickolai*, ninety-one potential jurors were examined before the jury could be seated; thirty-three of those examined were excused because they were related to either the defendant or the victim.[31] In addition, all of the jurors who were seated expressed some knowledge about the facts of the case.[32] This court held that it was an abuse of discretion not to grant Nickolai's motion for a change of venue.[33]

Likewise, in *Ward v. State*,[34] the trial court encountered difficulty when selecting a jury in the village of Fort Yukon. The court summoned 167 people to report for jury selection, but seventy-three of those summoned were excused for cause during the first day.[35] Approximately ten jurors remained after the parties had exercised all of their challenges for cause and peremptory challenges.[36] Many of those excused were related to the victim, the defendant, or both.[37] This court concluded that the judge did not abuse his discretion when he stopped jury selection and moved the trial to Fairbanks.[38]

Judge Morse faced difficulties similar to those in *Nickolai* and *Ward*. Many of the potential jurors in Saint Paul were familiar with the victim, the defendant, or both.

Many of the potential jurors were also familiar with the facts of the case. The judge could reasonably conclude that the process of jury selection, which involved a large portion of the population, would naturally increase the discussion of the case in such a small community. This discussion would make a second attempt to select a jury even more difficult. We therefore conclude that the trial court's decision to move the trial from Saint Paul was not an abuse of discretion.

### Lestenkof's Jury Represented a Fair Cross Section of the Community

 Lestenkof argues that the jury eventually empaneled in Dillingham excluded a fair cross section of the community where the alleged offense occurred. His argument is primarily based on the Alaska Supreme Court's decision in *Alvarado*.[39] *Alvarado* challenged the long-standing court practice of selecting jurors from the population living within a fifteen-mile radius of Anchorage. The court held that the Anchorage jury pool did not represent a fair cross section of Chignik, the community in which the crime occurred, because the jury selection area excluded almost all residents of Alaska Native villages.[40]

 Lestenkof must satisfy the following elements to establish that the jury selection process violated the fair-cross-section requirement:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is

---

30. 708 P.2d 1292 (Alaska App.1985).

31. *Id.* at 1293.

32. *Id.*

33. *Id.*

34. 997 P.2d 528 (Alaska App.2000).

35. *Id.* at 529.

36. *Id.* at 536 (Coats, J., dissenting).

37. *Id.* at 530–31.

38. *Id.* at 532.

39. 486 P.2d 891.

40. *Id.* at 903.

due to systematic exclusion of the group in the jury-selection process.[41]

On appeal, Lestenkof argues that the residents of Saint Paul comprise a distinctive group, different from other Alaska Natives, that is systematically excluded in the jury-selection process.

Lestenkof did not raise this argument in the trial court. In his arguments against a trial in Anchorage or Unalaska, Lestenkof submitted only that he was an Alaska Native of Aleut heritage. He argued that 85% of the residents of Saint Paul were Alaska Native or American Indian, compared to only 7.3% of the residents of Anchorage and only 7.7% of the residents of Unalaska. In response, the State submitted that Dillingham had a similar racial composition to Saint Paul, with 52.6% of the residents identifying as Alaska Native or American Indian. The superior court eventually selected Dillingham as the site for Lestenkof's trial.

On appeal, Lestenkof does not contend that Alaska Natives or residents of rural villages have been systematically excluded from the Dillingham jury pool. Lestenkof instead relies on historical sources suggesting that the residents of Saint Paul are a distinctive group for jury selection purposes. Lestenkof's claim fails for two reasons.

■ First, we note that there is a limitation on the *Alvarado* holding, which applies to this case. *Alvarado* did not hold that the citizens from the community where the crime occurred may never be excluded from the jury panel.[42] In particular, the area surrounding the location of the crime may be excluded from the source for jury selection when an unbiased jury cannot be drawn from that area.[43] The superior court was not required to include Saint Paul in the venire for jury selection because Judge Morse's ruling changing venue determined that a fair jury could not be drawn from that community.

■ Second, Lestenkof failed to argue and prove this point in the trial court. There are no prior Alaska cases recognizing that a single community can constitute a cognizable group for jury selection purposes.[44] Lestenkof bore the burden of proving to the trial court that there were significant differences between the residents of Dillingham and the residents of Saint Paul that would prevent the Dillingham residents from adequately representing a fair cross section of the community.[45] Lestenkof waived this claim by his failure to argue and prove to the trial court that the residents of Saint Paul are a cognizable group.[46]

We also note that the *Alvarado* court recognized that feasible alternatives may be employed for jury selection in the rural and predominately Native areas of the state.[47] One acceptable alternative is the selection of jurors from the state senate election district in which the crime is alleged to have occurred.[48] In this case, Judge Torrisi elected

---

41. *Tugatuk v. State*, 626 P.2d 95, 100 (Alaska 1981) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)); *see Berghuis v. Smith*, 559 U.S. ——, ——, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010).

42. *Alvarado*, 486 P.2d at 904; *see also Wyatt v. State*, 778 P.2d 1169, 1171 (Alaska App.1989) (affirming an order excluding residents of Metlakatla from the jury pool); *Kelly v. State*, 652 P.2d 112, 112 (Alaska App.1982) (affirming an order excluding residents of Ninilchik).

43. *Alvarado*, 486 P.2d at 904 n. 38 ("[I]t is well established that the area surrounding the location of the crime may be excluded from the source of selection when it appears that an unbiased jury could not be drawn therefrom.").

44. *See Wyatt*, 778 P.2d at 1170–71 (declining to identify residents of Metlakatla as a cognizable group where defendant failed to sustain his bur-

den of proof under *Tugatuk*); *Kelly*, 652 P.2d at 113 (finding offer of proof was insufficient to show residents of Ninilchik were a cognizable group where defendant offered no evidence regarding the attitudes, ideas, experiences, or beliefs of the members of the group in question).

45. *See Wyatt*, 778 P.2d at 1171; *Kelly*, 652 P.2d at 113.

46. *See Fawcett v. State*, Alaska App. Memorandum Opinion and Judgment No. 2007 (May 23, 1990), 1990 WL 10511504 at *2 (explaining that defendant waived his claim by declining to argue that the residents of Metlakatla were a cognizable group).

47. *Alvarado*, 486 P.2d at 905.

48. *Id.* A second alternative is that jurors may be selected from the entire judicial district in which the crime is alleged to have occurred. *Id.*

to hold Lestenkof's trial in Dillingham. Dillingham is not one of the urban centers referenced in *Alvarado*. Dillingham is a rural and predominately Native community in the same senate election district as Saint Paul.[49] Lestenkof has not established that any cognizable group was systematically excluded from the jury selection process conducted in Dillingham.

### The Jury Selection Process Did Not Violate Equal Protection

■ Lestenkof also argues that the jury selection process disqualified all Saint Paul residents in violation of their right to equal protection of the laws. This issue is similar to the issue resolved in the previous section of this opinion regarding the requirement that the jury must represent a fair cross section of the community. Ordinarily, the fair-cross-section analysis also applies to claims raised under the equal protection clause of the Alaska Constitution.[50] However, we will analyze this claim separately to address Lestenkof's argument.

■ "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race ... or on the false assumption that members of his race as a group are not qualified to serve as jurors."[51] Lestenkof's argument that a particular racial group was excluded by the change of venue to Dillingham can be analyzed in two different ways:

> On the one hand, a defendant may allege that the State or the trial court deliberately selected a particular venue with the objective of excluding a racial group; the venue was chosen with *discriminatory intent*. On the other hand, because the

move to a particular venue has resulted in the reduction or exclusion of a racial group, the defendant may claim he or she will not receive a fair trial; the venue change has had a *discriminatory impact*.[52]

Lestenkof has argued both of these equal protection claims at different times during this litigation.

In the trial court, Lestenkof argued that the State deliberately discriminated against Alaska Natives by using its peremptory challenges and challenges for cause, and by opposing the drawing of a special venire. Judge Morse concluded that the State's actions were not motivated by a desire to obtain a jury with a different racial or socioeconomic makeup than the population of Saint Paul. This claim has not been reasserted in this appeal, so there is no reason to reexamine Judge Morse's conclusion.

After Judge Morse declared a mistrial in Saint Paul, both he and Judge Torrisi attempted to choose trial locations with a racial composition representative of Saint Paul. But Lestenkof complains that the resulting venire did not include any Saint Paul residents. This is a type of discriminatory impact claim that we previously considered in *Brower v. State*.[53]

In *Brower*, the defendant claimed an equal protection violation because the population of Fairbanks, where his grand jury convened, had a much smaller percentage of Alaska Natives than Barrow, where the offense occurred.[54] This court concluded that in order to establish underrepresentation of a cognizable group, the defendant must establish a disparity between the proportion of the group that exists in the population from which the grand jury is chosen and the pro-

---

**49.** Dillingham is also in the same house election district as Saint Paul. See the description of House District 37 in the Revised Final Plan House Districts (Alaska Redistricting Board May 2002), http://ltgov.state.ak.us/elections/distdes.php and http://www.elections.alaska.gov/maps/districts/dist37.pdf. House districts are required by the Alaska Constitution to be "formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area." Alaska Const. art. 6, § 6.

**50.** *See Malvo v. J.C. Penney Co., Inc.*, 512 P.2d 575, 580 n. 7 (Alaska 1973).

**51.** *Batson*, 476 U.S. at 86, 106 S.Ct. at 1717 (internal citations omitted).

**52.** *State v. House*, 127 N.M. 151, 978 P.2d 967, 993 (1999).

**53.** 683 P.2d 290 (Alaska App.1984).

**54.** *Id.* at 291.

portion of that group among those selected to serve on grand juries.[55] We noted that, "[a]s long as the area from which the grand jury is chosen does not underrepresent a cognizable group when compared to the state as a whole, we will find no equal protection violation." [56]

Lestenkof did not litigate this claim in the trial court. So there is no record indicating that any cognizable group, such as Alaska Natives, was underrepresented in the Dillingham venire or the master list for the state as a whole. Lestenkof simply argues that the residents of Saint Paul were excluded from the jury selection area after the court changed the venue to Dillingham. As we noted above, this argument was resolved long ago by an express limitation in *Alvarado:* The area surrounding the location of the crime may be excluded from the source for jury selection when an unbiased jury cannot be drawn from that area.[57]

### Conclusion

"[E]ach step the state makes in including a defendant's community in his or her trial— and thus achieving greater general impartiality—increases the difficulty of obtaining jurors who are not biased in the narrow sense." [58] In the current case, we conclude that the superior court properly balanced these competing values by making a reasonable, diligent attempt to obtain a jury in Saint Paul. We therefore AFFIRM the superior court's judgment.

COATS, Chief Judge, dissenting.

Lestenkof was entitled to have his case tried, if possible, on St. Paul Island, the place where his crime allegedly occurred. The record in this case shows that Lestenkof made extensive efforts to have his case tried in Saint Paul. The State made similar efforts to avoid trying the case in Saint Paul. The State ultimately prevailed. The State succeeded in having Lestenkof's trial moved from Saint Paul to Dillingham, where he was convicted. In my view, the State has not met its burden of proving the necessity of depriving Lestenkof of his right to have his case tried in Saint Paul. I would accordingly reverse Lestenkof's conviction.

I base my conclusion on *Alvarado v. State,*[59] a case decided by the Alaska Supreme Court nearly forty years ago. In *Alvarado,* the supreme court condemned the practice of taking a defendant from a small rural community, where his crime allegedly occurred, and moving him to a large city, where the jury did not represent a fair cross-section of the rural community in which the crime allegedly occurred. The Alaska Supreme Court held that the defendant had a right to be tried by a jury that was representative of the place where the alleged crime occurred.[60] The *Alvarado* decision is based upon the defendant's constitutional rights to be tried by an impartial jury and his right to due process of law.[61]

The supreme court recognized that it would be difficult and expensive to conduct trials in some of the remote areas of the state. But the supreme court concluded that the United States and Alaska Constitutions required this result:

It is of paramount importance that the benefits conferred by the Constitutions of the United States and Alaska be extended with an even hand to the people of our state. When a large segment of the population lives in towns and villages scattered throughout the regions of the state, we cannot afford to succumb to the temptation of convenience by allowing the machinery of justice to become inflexibly entrenched within the enclaves of our major cities. Instead we must tailor our system of justice to meet the needs of the people. It is our judicial system which must take the

**55.** *Id.* at 292.

**56.** *Id.*

**57.** *Alvarado,* 486 P.2d at 904 n. 38.

**58.** Devon Knowles, *From Chicken to Chignik: The Search for Jury Impartiality in Rural Alaska*

*Native Communities,* 37 Colum. Hum. Rts. L.Rev. 235, 251 (2005).

**59.** 486 P.2d 891 (Alaska 1971).

**60.** *Id.* at 904.

**61.** *Id.* at 896–97, 903.

initiative to assure compliance with the mandates of the Constitution; we cannot simply neglect or ignore communities of individuals located in remote areas of the state. Justice must be made available to all of the people of Alaska.[62]

In its holding in *Alvarado*, the supreme court emphasized the necessity of selecting juries that represented the community. The court emphasized that the jury is "a safe-guard against the possibility of governmental tyranny and oppression.... As an institution, the jury offers our citizens the opportunity to participate in the workings of our government, and serves to legitimize our system of justice in the eyes of both the public and the accused." [63] The court pointed out that one of the factors precipitating the American revolution was the fact that the King of England had made a practice of transporting colonists to England for trial.[64]

St. Paul Island is the largest Aleut community in the United States.[65] Approximately 500 people live on the island, and approximately 86% are Alaska natives.[66] The people of St. Paul Island have a distinctive culture and history.[67] Lestenkof and his wife were long-term residents, who were well known by and related to many people on the island. It is not, therefore, surprising that there would be some difficulty in selecting a jury in Saint Paul. If a defendant has a good reputation, that will tend to be reflected in the jury pool. If the community has an interest in the case, that will also be reflected in the jury pool. In addition, there may be cultural differences in how members of the jury regard different offenses. Although these factors make it difficult to select a jury, those same factors are strong reasons for holding a trial in a place such as Saint Paul when the offense occurred there. If the defendant has a good reputation, he will have a "home field advantage." If there is significant interest in the community about the case, it is important that the community is able to participate in the trial and to see that justice is done in a way that reflects the values of the community. All of these factors are undermined if the defendant is forced to stand trial in a different community.

Consequently, the burden is upon the State to show that it was not reasonable to obtain a jury from the Saint Paul area once that area had been selected as the site of the trial.[68] In my view, the State has not met its burden of proof in this case.

The United States Census Bureau estimated that the population of Saint Paul in 2006 was 449.[69] The census fact sheet states that in 2000, 375 of the residents of Saint Paul were age eighteen or older.[70] And yet there were apparently only about ninety names on the list of people called for jury duty. Apparently only sixty-eight of these jurors appeared in court.

Judge Morse expressed concern about whether there were sufficient jurors. Lestenkof's attorney suggested that the court issue a public service announcement on the radio to ask more people to appear for jury service. Judge Morse agreed to do this, but questioned whether they would be able to obtain a full jury. Later, Judge Morse had the court clerk make telephone calls and other efforts to contact the jurors who had not appeared.

62. *Id.* at 905–06.

63. *Id.* at 903–04.

64. *Id.* at 902 n. 28.

65. http://www.amiq.org/aleuts.html.

66. U.S. Census Bureau, 2000 Census of Population and Housing, *Summary Population and Housing Characteristics*, PHC–1–3 Alaska 37 (2002), *available at* http://www.census.gov/prod/cen2000/phc–1–3.pdf.

67. http://www.tanadgusix.com; http://www.commerce.state.ak.us/dca/commdb/CIS.cfm?comm_boro_name=SaintPaul.

68. *Erick v. State*, 642 P.2d 821, 824 (Alaska App. 1982).

69. http://www.census.gov/popest/cities/tables/SUB–EST2007–04–02.csv.

70. U.S. Census Bureau, 2000 Census of Population and Housing, *Summary Population and Housing Characteristics*, PHC–1–3 Alaska 15 (2002), *available at* http://www.census.gov/prod/cen2000/phc–1–3.pdf.

In a felony case, each party is entitled to ten peremptory challenges.[71] But in this case, because the court and the parties anticipated having alternate jurors, each party was entitled to eleven peremptory challenges. Although it must have been clear that the court was going to have difficulty obtaining twelve jurors and that there would be no possibility of alternate jurors, the State exercised its eleventh peremptory challenge on the twelfth juror, leaving only eleven jurors to try the case.

Judge Morse stated that he could not force the State to go to trial with a jury of less than twelve unless they consented. Lestenkof's attorney asked the court to bring in potential jurors from St. George, a nearby island. The State objected. Judge Morse concluded that it was not possible to bring in additional jurors from St. George. He concluded that he was going to have to declare a mistrial unless he could come up with some additional jurors.

When court reconvened, Lestenkof's attorney pointed out that the State had used eleven peremptory challenges and that the State had been awarded the extra peremptory challenge on the basis that there would be alternate jurors. The attorney asked Judge Morse to revoke the State's peremptory challenge and reinstate the challenged juror. Judge Morse indicated that he would not revoke a peremptory challenge that had already been used. Next, Lestenkof's attorney asked to be able to revoke one of the peremptory challenges she had previously exercised. Judge Morse denied this motion. The defense made several other suggestions, including re-contacting jurors who had been excused on the basis of hardship or contacting people from the telephone book. The State opposed every suggestion. The State indicated that, in its view, the court had made considerable effort to obtain a jury in Saint Paul and that under these circumstances, the defendant was not entitled to have his case tried in Saint Paul. The State indicated that, in a prior murder case in Saint Paul, the court had obtained a jury pool of 230 people. But this had been done by a different procedure which had been agreed to by the public defender agency and the district attorney's office. Lestenkof's attorney pointed out that the pool of eligible jurors was obviously much larger than the number of jurors who had been summoned, so it would be possible to obtain more jurors. Judge Morse indicated that he was not going to take any further steps to obtain a jury. Lestenkof's attorney suggested that the State could stipulate to have the case tried by eleven jurors. But Judge Morse indicated that he would not require the State to stipulate. Judge Morse declared a mistrial.

The next day, Lestenkof's attorney again asked Judge Morse to expand the jury pool. She pointed out that apparently only one-third of the people eligible for jury duty had been summoned and that the court could easily obtain additional people available for jury service. She asked the court to supplement the jury panel and bring back the eleven members of the jury who had previously been selected. Judge Morse again denied the motion. He stated that he was unable to obtain a jury in Saint Paul.

The case was later transferred for trial from Judge Morse to Superior Court Judge Fred Torrisi, who resides in Dillingham. Lestenkof again argued that the case should be tried in Saint Paul. He pointed out that he was entitled to be tried in Saint Paul if possible, there were approximately 300 potential jurors in Saint Paul, and therefore it would be possible to obtain a jury in Saint Paul. Judge Torrisi declined to reconsider Judge Morse's decision to move the case from Saint Paul. Lestenkof was tried in Dillingham. The State chartered a plane to transport all of the witnesses from Saint Paul to Dillingham for the trial. Lestenkof was convicted.

Under the *Alvarado* decision, Lestenkof had the right to be tried in Saint Paul, the place where his alleged crime occurred.[72] In *Alvarado*, the supreme court recognized that it would be difficult and expensive to conduct trials in some of the remote areas of the state. It is obvious from the record that

---

71. Alaska R.Crim. P. 24(d).

72. *Alvarado,* 486 P.2d at 904.

Lestenkof concluded that his best chance at trial was to be tried in Saint Paul. Consequently he made every effort to obtain a trial in Saint Paul. Conversely, the record shows that the State concluded that the jury pool in Saint Paul would not be favorable to it. Consequently, the State used all of its peremptory challenges and consistently opposed any proposals which Lestenkof made to expand the jury pool or try the case in Saint Paul.

The State has the burden to show that it was not reasonable to obtain a jury from the Saint Paul area once that area had been selected as the site of the trial.[73] The State has not met this burden.

First, it appears that the court started out with an insufficient number of potential jurors to be able to seat a twelve-person jury. According to the census, 375 residents of Saint Paul were eighteen or older. It is reasonable to assume that 300 people were eligible for jury duty. Yet apparently only ninety potential jurors were asked to report for jury duty. When only sixty-eight jurors reported, Judge Morse immediately recognized that it was questionable whether there were sufficient potential jurors to select a jury. It was foreseeable that it would be difficult to select a jury in Saint Paul. It is clear that the court started out with an inadequate list of jurors. It appears from the record that, in an earlier case, the court had anticipated this problem and had obtained a jury pool of 230 people. That was not done in this case.

Second, although Judge Morse certainly made significant efforts to obtain a jury based upon the limited list with which he started, in my view he should have been willing to take additional measures to secure Lestenkof's right to have his case tried in Saint Paul. The case law supports this. *Calantas v. State*[74] involved a trial in Kodiak. In order to obtain a sufficient jury pool on short notice, the clerk of court obtained fourteen additional potential jurors from a list of 300 people. In order to do this, in violation of state statutes and a court rule, the clerk excluded approximately 100 people who did not live in Kodiak. From the remaining 200 names, she identified those whose names appeared in the Kodiak telephone directory. This left eighty names. From these people, the clerk was able to reach fourteen. Those fourteen, together with twenty-one from the original list, made up the panel of prospective jurors provided for Calantas's trial.[75]

Calantas objected to the method the court used to obtain the jury pool. He pointed out that the clerk's decision to disqualify all of the potential jurors who lived outside of Kodiak and to only summon the residents of Kodiak that she could reach by telephone was in clear violation of Alaska statutes and the court rules.[76] The Alaska Supreme Court stated:

> Selection of jurors by any method which fails to substantially comply with the statutory requirements is reversible error if the failure "prejudices the rights of a party." Here there is no doubt that there were technical violations of the statutory selection methods; like the Fifth Circuit, however, we believe that such violations "constitute 'substantial failure to comply' [only] when they affect the random nature or objectivity of the selection process." [77]

The Supreme Court upheld the trial court's finding that "the situation was the result of extraordinary circumstances calling for him to exercise his discretion" and upheld his finding that "the selection procedures had not prejudiced the defendant." [78]

In addition, in *Erick,* we concluded that the trial court had not made an adequate effort to secure a jury trial for the defendant in Fort Yukon.[79] But we went on to say that, if the trial court had used reasonable efforts to obtain a jury in Fort Yukon but had been unable to do so, we would "be inclined to uphold the trial court's decision to

---

73. *Erick,* 642 P.2d at 824.

74. 599 P.2d 147 (Alaska 1979).

75. *Id.* at 149.

76. *Id.*

77. *Id.* (citations and footnote omitted).

78. *Id.* at 150.

79. *Erick,* 642 P.2d at 826–27.

give Erick a choice to have his case tried before a jury of seven selected from the Fort Yukon area, or before a jury of twelve with the jury panel supplemented from the Fairbanks area." [80]

Reading *Calantas* and *Erick* together, it is clear that Judge Morse had numerous options to secure Lestenkof's right to have his case tried in Saint Paul. He could have started out with a more extensive list of jurors, or he could have taken other actions, many of which were suggested by Lestenkof's attorney. He also could have given Lestenkof the opportunity to be tried by a jury of eleven. It is clear from the record that Lestenkof would have availed himself of this opportunity.

It is therefore clear from the case law that Judge Morse had numerous options available to him to obtain a jury in Saint Paul. In *Calantas,* the Alaska Supreme Court approved departing from the normal procedures for selecting a jury over the defendant's objection in order to hold a trial in Kodiak. And this court approved even more of a departure in *Erick,* had the defendant consented to such a departure. Yet even though it is obvious that Lestenkof would have agreed to almost any procedure to obtain a trial in Saint Paul, Judge Morse refused to consider these options.

From the record, it seems clear that Judge Morse was unaware of the full extent of his authority. We have previously held that when a court does not "consider the various alternatives available as a matter of discretion ... the court [has failed] to exercise any discretion at all." [81]

There is no question that it is extremely difficult to conduct trials in relatively isolated areas such as St. Paul Island. But in *Alvarado,* the Alaska Supreme Court made the decision, as a constitutional matter, to bring justice to all of the citizens of Alaska. For an individual defendant, such as Lestenkof, it was obviously critical for him to be tried in the area where he was known and where he was part of the culture. Also, for the residents of Saint Paul, it was important for them to see that justice was done and to participate in the justice system. Instead, Lestenkof and all of the witnesses were hauled off to Dillingham for trial. Lestenkof had a constitutional right to be tried in Saint Paul if at all possible. And it seems clear to me, from this record, that it was possible for him to be tried in Saint Paul.

In my view, unless we have a high standard for requiring defendants to be tried in places such as Saint Paul, defendants in those areas will frequently be deprived of their right to be tried in those areas and the promise of *Alvarado* to bring justice to all of the areas of Alaska will be compromised unnecessarily. I therefore dissent from the decision of the court.

---

80. *Id.* (footnote omitted).

81. *Cano v. Anchorage,* 627 P.2d 660, 664 (Alaska App.1981).